[No. S074624. Jan. 14, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
TOMMY JESSE MARTINEZ, Defendant and Appellant.

914

COUNSEL

Christopher Johns, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, John R. Gorey and Joseph P. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**MORENO, J.**—On June 3, 1998, a jury found defendant Tommy Jesse Martinez guilty of the rape, robbery, and murder of Sophia Castro Torres. (Pen. Code, §§ 261, subd. (a)(2), 211, 187.)[1] The jury found true the special circumstance allegations of rape and robbery and further determined that defendant personally used a knife, a deadly and dangerous weapon, in committing the crimes against Sophia. (§§ 190.2, subd. (a)(17)(A), (C), 12022, subd. (b).)

The jury also found defendant guilty of assaulting three other women. The jury found defendant guilty of assaulting Maria M. with a deadly weapon, assaulting her with the intent to commit rape, kidnapping her for robbery, and kidnapping her with the intent to commit rape and oral copulation. (§§ 245, subd. (a)(1), 220, 261, subd. (a)(2), 209, subd. (b); former § 208, subd. (d).) The jury further determined that defendant personally used a knife, a deadly and dangerous weapon, in committing the crimes against Maria. (§ 12022, subd. (b).) The jury found defendant guilty of assaulting Laura Z. with the intent to commit rape and that he used a knife, a deadly and dangerous weapon. (§§ 220, 261, subd. (a)(2), 12022, subd. (b).) The jury found defendant guilty of assaulting Sabrina P. with a deadly weapon, assaulting her with the intent to commit rape, and attempting to kidnap her with the intent to commit rape and also found that defendant used a knife, a deadly and dangerous weapon in the offenses. (§§ 245, subd. (a)(1), 220, 261, subd. (a)(2), 664; former § 208, subd. (d); § 12022, subd. (b).) The jury found that defendant was not guilty of attempting to kidnap Sabrina for robbery, but was guilty of the lesser offense of attempting to kidnap her. (§§ 664, 207, 209, subd. (b).)

After a penalty trial, on June 23, 1998, the jury returned a verdict of death. The court denied a motion for a new trial and the automatic application to

---

[1] All statutory references are to the Penal Code unless otherwise specified.

modify the verdict (§ 190.4, subd. (e)) and sentenced defendant to death. This appeal is automatic. (§ 1239, subd. (b).)

We affirm the judgment.

## I. FACTS

### A. *Guilt Phase*

#### 1. *The Prosecution's Case*

##### (a) *The crimes against Sophia Torres*

Sophia Torres was born in Mexico in 1961 and moved to Arizona when she was 23 years old. Around 1994, because she had broken up with her longtime boyfriend, Sophia moved to Santa Maria, California, where three of her sisters lived. Approximately eight months later, she moved back to Arizona and learned that her ex-boyfriend had been shot and killed. She returned to Santa Maria in October 1995.

Sophia, who had been a hard-working and outgoing person, was deeply affected by her boyfriend's death and became withdrawn and reclusive. She did not have any boyfriends and was described as a loner who did not use alcohol or drugs. She worked odd jobs and was homeless, living mostly in a shelter, but she remained a very neat and clean person.

At one point, she briefly worked as a bartender at the Tres Amigos bar in the La Joya Plaza, but was let go after two weekends because she was "very meek" and "too inhibited" to be a bartender. While she worked there, she never drank, and, after she was let go, she never came back to the bar as a patron or to socialize.

In the week before her murder, Sophia stayed with a friend of her sisters', Ofelia Francisco. According to Mrs. Francisco, Sophia kept to herself. Sophia's routine was to leave the house around 8:30 or 9:00 a.m. and return around 9:00 or 10:00 p.m.

On the morning of November 15, 1996, Sophia left Mrs. Francisco's home at around 9:00 a.m. She was wearing a long blue jacket over a long black dress and was carrying her purse. As she usually did, Sophia stopped at the local Salvation Army where she sat alone and had lunch.

At some time around 10:30 or 11:00 p.m. that night,[2] Sophia was assaulted and killed in a baseball field in Oakley Park, a few blocks south of Mrs. Francisco's home.

At 11:07 p.m., at a pay phone in La Joya Plaza, several blocks south of the park, an anonymous male dialed 911 and reported that "a lady" was being attacked in Oakley Park with baseball bats by "two Black girls" who were "kinda heavy set." When the 911 dispatcher realized the location of the pay phone, she asked the caller why he had called so far away from the scene, but the caller hung up. The call was recorded.

At 11:08 or 11:09 p.m., Santa Maria Police Officer Louis Murillo arrived at Oakley Park in response to the 911 call. Due to the poor lighting conditions, Officer Murillo drove into the park to investigate. Using his patrol car's lights, he noticed a female lying on the ground near the snack bar. There was fresh blood all around her and he called for an ambulance. He checked for vital signs and did not find any.

Because the grass was wet, fresh bicycle tracks were visible on the grass between the snack bar and a large tree, leading to the street.

Based upon the location of personal items and blood spatter marks found at various places at the park, it appeared Sophia was attacked multiple times as she tried to flee her attacker. At the bleachers on the third base side of the baseball diamond, police found a fingernail file, toothbrush, and pencil that may have come from Sophia's purse.[3] On the bleachers, there were also long strands of black hair that could have belonged to Sophia. Behind home plate, in the walkway between the backstop and the snack bar, there was blood spatter on the wall of the snack bar. Blood spatter in the bleachers on the first base side of the diamond indicated that Sophia had run into those bleachers. It appeared that Sophia had run under the bleachers and stopped at one end, as the blood spatter there was consistent with someone standing still and bleeding downward. The area where Sophia's body was found was a section of concrete near the snack bar. She was lying on her back, with her long dress hiked up above her knees. There was a large amount of blood on the ground around the victim and a larger pool of blood a few feet away, indicating that she had lain in that spot for some time and bled. There was a palm print next to this pool of blood.

Sophia's body had multiple bruises with crush-type lacerations consistent with having been hit with a smooth, blunt object like a baseball bat. The ring

---

[2] This is based on the coroner's estimated time of death.

[3] Her purse was found the next morning in the backyard of a residence adjacent to the park.

and little fingers of Sophia's right hand were swollen and bruised, as if her hand had been hit while fending off her attacker. She had a large bruise to her left breast area and over her left hip. The left side of her head was swollen and bruised, as if hit repeatedly by a blunt object. Her nose was broken, with bone fragments protruding through her skin, and the bridge of her nose was indented and had sunk inward due to a large crush-type laceration. Her right ear was bruised, with a small, crush-type laceration. Although her skull was otherwise intact, her brain had swollen to the point of flattening out in some areas, as opposed to having a normal wrinkled appearance. The coroner concluded that Sophia died due to blunt force trauma to the left side of her head, which caused cerebral contusions with acute subarachnoid and subdural hemorrhage.

On the right of Sophia's face, extending from the hairline of the temple to her cheek, was a very deep and sharp-cut laceration measuring three and a half or four inches long, three-quarters of an inch wide, and almost as deep. The wound was consistent with having been inflicted by a knife. She also had relatively minor cuts to her left hand and right elbow and had abrasions to both knees.

Sophia had no bruising, no tearing, and no trauma to her vagina, but the pathologist, Dr. Robert Failing, believed that the lack of such injuries did not rule out the possibility of sexual assault. Sperm was detected on Sophia's dress and on vaginal swabs taken from her. Subsequent DNA analysis of the vaginal swabs identified a match with a blood sample obtained from defendant. The DNA profile recovered from the vaginal swab occurs at an expected frequency of one in 2.2 million persons, or one in 3.75 million Hispanics.

At the time of her death, Sophia did not have any alcohol or drugs in her system.

(b) *The other assaults*

(1) *The assault on Maria M.*

Two weeks before Sophia's murder, on November 3, 1996, Maria M., then aged 16, was walking to work at a nearby discount mall in La Joya Plaza, taking her usual shortcut through an alleyway. As she exited the alley and entered a pedestrian walkway into the mall property, a man she later identified as defendant grabbed her from behind with one arm and held a knife blade against her neck with his other arm. Maria tried to pull away, but defendant held her tighter, grabbed her by her hair, and pulled her about 180 feet back into the alleyway. Defendant untied her shirt and tried to take off her belt and unzip her pants. When Maria asked what he wanted, defendant replied, "I want you. I want to mark your beautiful face."

Maria believed that defendant wanted to rape her. Defendant tried to kiss her and his breath smelled like "[c]hocolate with peanuts, like a Snickers bar." As Maria continued to struggle, a young man appeared in the alley and yelled at defendant. Defendant pushed Maria away from him, but then punched her in the face. Defendant then ran off. The young man came to Maria's aid and called the police. Maria later realized that her pager was missing.

One month later, Maria identified defendant as her attacker when police presented her with a six-person photographic lineup that included a picture of defendant. Maria was 100 percent certain that the photograph was of her attacker.

### (2) *The assault on Laura Z.*

Just over two weeks after Sophia's murder, on December 2, 1996, about 6:15 p.m., Laura Z. was leaving her job at a department store in the Town Center mall in Santa Maria. As she walked toward her truck, which was parked in the mall's parking structure, Laura noticed defendant standing on the side of the ramp, leaning against a wall. After Laura got inside her truck and closed her door, she saw defendant running behind her. Laura reacted by immediately locking her door, just before defendant reached it and tried lifting the truck's door handle. Defendant looked from side to side, as if he was surprised that the door was locked.

Defendant then pointed to his wrist and asked Laura what time it was. She replied, "I don't know." Defendant then looked around again and ran away.

Laura believed defendant's intentions were "bad or evil," and was frightened by the encounter. After she drove home, Laura told her husband about the incident, and he called the police.

A few days later, the police showed Laura a photographic lineup, and she identified defendant's photograph as that of her assailant. On a scale of one to 10, Laura rated her certainty about her identification as a "10."

### (3) *The assault on Sabrina P.*

Two days after the incident with Laura Z., on December 4, 1996, about 9:00 or 9:30 p.m., Sabrina P. was leaving her job at the Town Center mall. Sabrina's mother was supposed to pick her up, so she waited while seated on a bench outside the mall.

Soon after Sabrina sat down, defendant appeared from behind a cement wall of the parking structure and started walking toward her while looking

from right to left. Defendant sat down next to Sabrina with his shoulder touching hers, pulled out a small knife, and held it against her right side, saying, "Don't move, don't scream and I won't have to stab you." Defendant told Sabrina to come with him, but she said she was not going anywhere because she had just called her mother, who would be arriving any second. She believed that defendant intended to rape her.

Defendant repeated his demand that Sabrina go with him, but then said, "Get your hand off my knife." Sabrina suddenly realized that she had grabbed the handle of defendant's knife. She refused to let go of the knife, thinking he might stab her if she did. As they stood up and struggled over the knife, Sabrina began to scream, and defendant grabbed her other wrist with his free hand. A motorcyclist passed by, but appeared not to hear Sabrina's screams. During their struggle, defendant said, "Okay, I'll leave. Just give me my knife. Just let go of my knife and I'll leave." After further struggling, defendant let go of the knife and walked away calmly as if nothing had happened. As defendant slowly walked away, he turned around and smirked. Sabrina told him that he would not get away with what he did. She made a point of observing defendant carefully as he walked out of view so she was certain of what he looked like and what he was wearing.

Sabrina, still holding the knife in her hand, then ran to a nearby restaurant and pounded on the door but a woman inside refused to open it. Sabrina pleaded for the woman to let her in; the woman still refused but agreed to call 911. The 911 operator convinced the woman to let Sabrina into the restaurant, where she got on the phone and described defendant.

While Sabrina was on the phone with the 911 operator, Santa Maria Police Officer Jeff Lopez received a call from dispatch regarding a possible attempted kidnapping outside the mall restaurant. The dispatch operator described the suspect as a Hispanic male wearing a black, hooded sweatshirt. After driving through the mall's parking structure, Officer Lopez saw a person matching that description riding a bicycle down an adjacent street. That person was defendant.

Defendant made eye contact with Officer Lopez, but began to pedal faster. Officer Lopez could not maneuver his patrol car over to stop defendant because a traffic island prevented him from crossing the street. Instead, Officer Lopez radioed to other officers, who intercepted defendant and detained him.

Officer Lopez arrived at the scene of defendant's detention, told defendant to identify himself, and asked where he was coming from and where he was going. Defendant admitted he had come from the mall and was going home,

but Officer Lopez pointed out that defendant had been headed in the opposite direction from his home address. Defendant then claimed he was going to his cousin's place on Boone Street first, although he was unable to give Officer Lopez a specific address. Officer Lopez pointed out that Boone Street was also in a direction opposite to that in which defendant had been traveling. Defendant claimed he might have gotten lost. Officer Lopez then asked defendant to sit down on the curb.

After the police arrived to meet Sabrina at the mall restaurant, they told her they had already detained someone nearby who matched the description she had provided. Santa Maria Police Officer Al Torres took her to the location where defendant was being detained, and Sabrina identified him "without a doubt or a second guess."

### (c) The investigation

#### (1) Defendant's statements during his arrest

After Sabrina identified defendant as her attacker, Officer Lopez placed defendant under arrest. At the restaurant, outside defendant's presence, Sabrina had given the knife to Officer Torres. While the officers transported defendant to the police station, Officer Torres radioed that he had the "item used" in his possession. Although no one had mentioned a knife, defendant asked if an officer had found a knife. Officer Torres replied, "Who said anything about a knife?" Defendant stated that he thought he had heard one of the officers mention finding a knife.

At the police department, Officer Lopez questioned defendant. Defendant claimed he had gone to the mall to meet his cousin, but did not find her and left on his bicycle. Defendant denied meeting or assaulting Sabrina P.

#### (2) Defendant's statements during the first recorded interrogation

The following day, on December 5, 1996, the police began to suspect that defendant was also involved in the assaults against Maria M. and Laura Z., and the murder of Sophia Torres.

Santa Maria Police Detective Gregory Carroll had been assigned to the investigation of Sophia's murder along with his partner, Detective Mike Aguillon. On the morning of December 5, 1996, the detectives thought they might be able to determine whether defendant was involved with Sophia's murder by comparing defendant's voice with the recording of the man who made the 911 call shortly after the murder. Earlier that morning, they had

played the 911 recording to defendant's probation officers, who believed the recording matched defendant's voice.[4]

With a tape recorder running, the detectives introduced themselves to defendant and asked him a few questions about the assault on Sabrina P. the night before. Defendant again denied assaulting Sabrina and repeated his claim that he was at the mall to meet his cousin. The detectives then took a break, excused themselves from the interrogation room, and compared the taped portion of the conversation with the 911 tape.

Believing that defendant's voice matched that of the 911 caller, the detectives returned to the interrogation room and began to question defendant about Sophia's murder.

Defendant initially denied being the 911 caller, but then admitted making the call after Detective Carroll told defendant that both his probation officers had identified the caller's voice as his. Defendant claimed he had gone to meet Sophia at Oakley Park to buy "crank" from her, but, when he arrived, he saw two Black women chasing Sophia through the park and hitting her. He claimed he observed this from the street and that he also saw a man in "a little beat up car" parked on the street. Defendant told the detectives that he did not go into the park, but just kept walking. He said he was wearing a white T-shirt, white pants, and a white baseball cap. He claimed he went home, but then decided Sophia needed help, and so he walked to a pay phone to make the 911 call. He told the detectives that he did not want to identify himself on the 911 call because he was high on "crank" and did not want to get arrested.

Defendant claimed that when he last saw Sophia, she was being chased from the playground area and into the baseball field. But when Detective Carroll asked defendant why he told the 911 operator that Sophia was being attacked at the snack bar, defendant hesitated and said, "I just wanted somebody to go out there quick." He denied killing or hitting Sophia, but said he would be unable to identify the two Black women.

Defendant initially said he had bought "crank" from Sophia before, but after Detective Carroll explained that Sophia was a "semi-transient" and that "nothing" indicated that she was a drug dealer, defendant claimed that he had met her for the first time that night and was going to the park to buy "crank" from her for the first time as well. Defendant said he had met her earlier that

---

[4] This evidence was admitted not for the truth of the matter asserted, but for the limited purpose of explaining the detectives' conduct in their investigation. In addition, the audiotapes of the 911 call and defendant's interrogations were played for the jury to hear and make their own assessment as to whether the voices matched.

night at the Tres Amigos bar at La Joya Plaza. After Detective Carroll pointed out defendant's inconsistent statements about buying "crank" from Sophia, explained that she could not have been a drug dealer, and explained that it was not possible for defendant to have seen Sophia in the pitch-black park from the street, defendant admitted his story did not make sense.

The detectives encouraged him "to think about it," and ended the interrogation.

### (3) Search warrants and witness identification

During the course of the day on December 5, 1996, police officers located Maria M. and Laura Z. and, as described above, they each positively identified defendant's picture in the photographic lineups presented to them.

On the same day, Detective Aguillon participated in the execution of a search warrant at defendant's residence. Detective Aguillon searched defendant's bedroom and found a can of Fabulous brand cleaning fluid and a bottle of hydrogen peroxide on his closet floor, but found no white T-shirt, white pants, or white baseball cap.

About 5:00 p.m. that day, Detectives Carroll and Aguillon then executed a second search warrant by taking defendant to a hospital, for a nurse to collect his blood, hair samples, and additional evidence for a sexual assault kit. During the ride to the hospital, the detectives asked defendant to repeat his explanation of what happened on the night of Sophia's murder. Defendant again described how he had gone to the park to buy "crank" from Sophia, but then saw two Black girls chasing her, one hitting Sophia with her fists and the other holding a bat. Defendant described Sophia's attackers as being about five feet six or five feet seven inches tall and "chunky." Contradicting his previous statement, defendant now said he thought he would be able to identify them.

### (4) Defendant's statements during the second
### recorded interrogation

At 7:00 p.m. on December 5, 1996, Detectives Carroll and Aguillon returned defendant to the police station from the hospital, and began a second recorded interrogation.

In this interrogation, the detectives told defendant that two other women had now identified him as a suspect in two different incidents. Detective Carroll briefly described the incidents reported by Maria M. and Laura Z. The detectives also explained how Maria and Laura had both unequivocally

identified defendant after being shown a photographic lineup. Detective Aguillon explained defendant's predicament—that three different women, who did not know each other, all described defendant as their attacker in incidents occurring within a month and a half. The detectives also explained that the small paring knife defendant had used to assault Sabrina P. had a handle that matched a set of knives found at his residence.

Defendant denied involvement in any of the three assaults and claimed the three women must be mistaken or lying.

As to Sophia's murder, defendant again denied hitting her or having any physical contact with her. Defendant claimed he mentioned the snack bar on the 911 call because he had seen the girls chase Sophia towards the snack bar. Contrary to what he had said in the first recorded interview, he now claimed he had not seen them coming from the playground. But when the detectives pointed out that it was not possible for him to have seen Sophia at the snack bar from his location on the street, defendant claimed, for the first time, that he had walked off on an adjacent street and then returned to the edge of the park, and that was when he saw them running towards the snack bar.

The detectives said they did not find defendant's story credible and told him that no witnesses reported seeing any Black females in the area that night. They also told defendant they had spoken with people at the bar where defendant had claimed he met Sophia on the night of her murder and that the detectives had been told that Sophia did not "hang out there." The detectives told defendant that Sophia was penniless, did not sell methamphetamine, and was only near Oakley Park because that was the route she took to walk home. Defendant did not change his story.

### (5) *Defendant's final interrogation*

The next morning, on December 6, 1996, Detectives Carroll and Aguillon again met with defendant. This interrogation was not recorded.

Defendant repeated his story about two Black females assaulting Sophia. But when the detectives confronted him about the assaults against the other women and asked whether they were lying, defendant admitted, "I did those." He claimed, however, that he had not intended to rape either Maria M. or Sabrina P., but had only intended to rob them. He also explained that he had not tried to remove Maria's pants, but had only tried to go through her pockets. He did not know why he had punched her.

Defendant continued to deny any involvement in the Laura Z. assault.

### (6) *Additional investigation*

Employees at the Tres Amigos bar did not see either defendant or Sophia at the bar on the night of her murder.

At the time of the crimes, Oakley Park, including its baseball field, had no artificial illumination at night. In addition, according to the testimony of astronomer David Kary, on the night of the murder the moon had set at 9:38 p.m., well before Sophia's estimated time of death. Under similar lighting conditions, the prosecutors reenacted defendant's version of how he observed the attack on Sophia inside the park while Kary observed from the street adjacent to the park. Kary testified it was not possible to see persons inside the park from his location on the street, and that, at best, he was only able to see the prosecutors briefly in silhouette.

In addition, Detective Carroll tried to reenact defendant's claimed route on the night of the crimes by foot and by bicycle. His trip between Oakley Park and defendant's residence took seven and a half minutes by foot and nearly three minutes by bicycle. His trip from defendant's residence to the pay phone defendant used to make the 911 call was four and a half minutes by foot and two minutes by bicycle.

### 2. *Defendant's Case*

Keith Gorman, a paramedic who arrived at Oakley Park on the night of Sophia's murder, observed a single set of bicycle tracks in the wet grass, which were east of third base outside the dugout and ended on the adjacent street, near the middle of the block.

Defendant's younger brother, Mario Martinez, testified that sometime in November 1996, defendant came home with a pager. Because the pager kept ringing, defendant asked Mario to answer the page. When Mario called the number, a girl answered and said it was her pager. Mario asked her what the pager number was, got the number, told the girl she had paged the wrong number, and then hung up. Defendant told Mario that he stole the pager from a girl at La Joya Plaza by snatching it from the outside of her pocket as she walked by. Mario kept and used the pager for a few weeks, but later threw it away.

Francisco Javier Lopez testified he witnessed the assault of Maria M. in the alleyway near the La Joya Plaza discount mall on November 3, 1996. While he was parked in his truck, he saw what appeared to be a boyfriend and girlfriend fighting, and the man was trying to stop the girl from entering the mall's walkway entrance. The girl made eye contact with Lopez, and he

realized that she needed help. Lopez activated his truck's alarm manually, and the man appeared surprised but reacted by pulling the girl out of Lopez's view and into the alleyway. Carrying a heavy flashlight and his phone, Lopez exited his truck and approached the alley. He saw them struggling halfway down the alleyway, where the man hit the girl and then ran off. Lopez may have yelled at the man to let her go. He called 911, and ran over to help the girl. The police arrived a few minutes later. Lopez could not identify defendant as the assailant.

### 3. *Prosecution Rebuttal*

The prosecution presented evidence indicating that Maria M. deactivated her pager on November 4, 1996, and that the pager would not have functioned after that date. Because her pager was missing after the assault, Maria made one call to her pager the very same day, and a young man called her back. She then immediately called to have her pager disconnected, but the pager company could not disconnect it until the next business day, which was Monday, November 4, 1996.

### B. *Penalty Phase*

#### 1. *Prosecution's Case*

##### (a) *Prior crimes*

###### (1) *Robbery of an ice cream shop*

On April 24, 1992, at the age of 14, defendant robbed a cashier at an ice cream shop. On that date, Alicia Anaya was working at the Delicias de Mexico ice cream shop at La Joya Plaza. Defendant entered the shop and demanded money from Anaya. Before she gave him the money, the shop's phone rang a few times, and each time defendant picked up the phone and hung up. As he left the shop with the money, he told Anaya that she was pretty and tried to reach for her hand, but she blocked him.

A few days later, Anaya was working with her boss when she saw defendant and another boy walking by the shop. Anaya told her boss that defendant was the person who had robbed the shop. Her boss ran outside, but she was only able to grab defendant's companion. Later, the police took Anaya to a house where she positively identified defendant as the person who had robbed the shop. Defendant initially denied committing the robbery, but later admitted it, claiming that a friend of his needed the money.

###### (2) *Burglary at a bread store*

On September 1, 1993, at the age of 15, defendant was detained during an investigation of a burglary at a bread store. Initially, defendant provided the

officer with false identifying information. The investigating officer noticed that defendant's right pants pocket was sagging, as if it contained something heavy. The officer conducted a patsearch and removed a dagger from defendant's pocket.

### (3) Robbery of Pepe's Liquors

On February 23, 1994, at the age of 16, defendant and a friend attempted to rob Francisco Chavez at knifepoint. While Chavez was working at Pepe's Liquors, defendant and his friend entered the store. Defendant held a knife and demanded money. Chavez refused and activated his silent alarm, and the store received a phone call seconds later. While defendant and his friend were still in the store, Chavez reported that he was being robbed. Defendant and his friend ran off, but were stopped by a police officer.

The arresting officer did not find a knife, but defendant admitted his involvement. Defendant stated that he did not intend to rob Chavez and that it was a joke.

### (4) Knife possession

On April 22, 1995, at the age of 17, defendant encountered his probation officer and a police officer at a community strawberry festival. In a probation search, the officers found an unsheathed hunting knife tucked into defendant's waistband.

### (5) The Alejandre incident

On April 2, 1996, at the age of 18, defendant was involved in an attack on the Alejandre household. Willie Alejandre, then aged 16, was at a friend's house, across the street from his own, drinking beer with some friends. An older man approached Willie and began fighting with him, claiming that Willie had fought his cousin. Willie ran off when he heard the older man call out to his friends for a gun. Willie ran back home and was chased by a group of young men, including defendant.

After Willie ran inside his home, he closed the door and told his mother, Josephina, to call the police. The young men began pounding on the Alejandres' front door and kicked it open. Defendant stood in the doorway and demanded that Josephina "hand over Willy." When she refused, defendant threw a flower pot at her, and the other young men threw flower pots through her windows. Defendant also threw a beer can.

Josephina's husband grabbed a hammer and began to chase away the young men. A neighbor, Gabriel Resendez, also came outside with a baseball bat. Defendant confronted Resendez with a broomstick and hit his truck with it.

As the police arrived, the young men ran off, but defendant was chased down by a police officer and arrested. Despite being identified by the Alejandres and their neighbor, defendant denied any involvement in the attacks.

### (b) *Victim impact*

#### (1) *Sophia Torres's family*

Sophia Torres's older sister, Victoria Francisco, testified that Sophia's death seemed like a "dream" to her and that it was difficult for her to realize that she was dead. What hurt her most was thinking of "all that [Sophia] went through" and how she "suffered that night" before her death. She remarked that Sophia never harmed anyone.

Sophia's oldest brother, Gilberto Torres, testified that Sophia lived with him in Phoenix for a time. Sophia had problems and was a shy person, but he had hoped that she would one day return to her normal self and become an independent, hard-working person again. When Gilberto attended her funeral and opened her casket, he could not recognize her face. He thinks about Sophia every day, "especially for the brutal way she died."

Sophia's father, Angel Torres, often thought of Sophia, "felt her death very deeply," and explained that his family "never had such a case." It was not fair for Sophia to have had that "stroke of luck" because she was not a bad person and never harmed anyone.

#### (2) *Maria M.*

Maria M. testified that, in the first two weeks following defendant's assault, she would become frightened when a man came near her, but, little by little, eventually overcame this fear. Whenever she is out alone or with a friend, however, she is still afraid of encountering young men who look like defendant. She used to love chocolates, but can no longer eat or smell Snickers bars because they evoke her memory of the assault. Since the incident, Maria's mother is also very afraid and worries about her.

#### (3) *Sabrina P.*

Sabrina noted that she has become very nervous around men as a result of defendant's assault. She recounted an incident a week after her assault where

she encountered a male customer at the clothing store where she worked. It was near closing time and the store was empty except for her and a fellow salesclerk. The man was wearing gloves and asked Sabrina if she could help him find a pair of jeans for his girlfriend even though he did not know her size. Sabrina thought this was weird and became frightened, thinking he wanted to hurt her. She then panicked, walked to the back of the store, and asked the other salesclerk to help the man.

Because of defendant's assault, Sabrina changed her habits and is now more aware of her surroundings.

### (c) Conduct while in custody

While defendant was awaiting trial on this case, on March 21, 1998, a correctional officer at the Santa Barbara County Main Jail in Goleta found a handmade knife, sharpened from the handle of a plastic eating utensil, hidden in his cell. According to the officer, a knife is considered "critical" contraband and poses a safety hazard to both inmates and officers.

### 2. Defendant's Case

### (a) Defendant's family history

Defendant's parents, Eva Martinez and Tommy Martinez (Tommy Sr.), met in Santa Maria when he was 15 years old and she was 13. Tommy Sr. and many of his siblings had problems with alcohol. Although Eva's father objected to her relationship with Tommy Sr., her parents forced them to marry when Eva became pregnant with defendant at the age of 16. On October 10, 1977, defendant was born. Their second son, Isaac, was born on February 27, 1979.

When defendant was nearly a year old, Tommy Sr. was incarcerated for rape and he remained largely absent from defendant's early childhood due to repeated violations of his parole. Defendant, however, developed a close bond with his maternal grandmother, Dorothy. In brief periods in which Tommy Sr. was in the household, he and Eva had numerous arguments in front of the boys, some of which became physical.

At school, defendant initially had difficulty keeping up with the other children and had to repeat kindergarten, but did well in first grade. Tommy Sr. and Eva also had a third son, Mario. Although Tommy Sr. would often go to bars and stay out late on work nights, on weekends he would take the boys bike riding, which they enjoyed.

In 1987, when defendant was 10 years old, Tommy Sr. began having an affair with a woman who lived across the street from their house, and he eventually moved out to live with her. Before he moved out, Eva became pregnant with their fourth child, Angel, but that did not deter Tommy Sr. from leaving. He said goodbye to his children and left the household.

The couple's fourth son, Angel was born on November 20, 1987. Soon after, defendant's grandmother, Dorothy, was killed in a car accident. At the end of 1988, Tommy Sr. entered a rehabilitation center for alcoholics, but later secretly moved to Oklahoma. He did not maintain any contact with defendant's family for an entire year. The death of his grandmother and the disappearance of his father upset defendant and made him feel lonely.

Around this time, defendant began spending time with the family of Tommy Sr.'s brother, Rick Martinez. Rick often brought defendant to church where he related well with other children in his youth group.

During this period, defendant began to get into trouble. At the age of 12, defendant and his brother Isaac were arrested for stealing video cassettes from a department store, but were not prosecuted. Defendant also started doing poorly in the seventh grade and began skipping school. Eva did not encourage him to go to school. In fact, on days when she was feeling depressed, Eva would pick up defendant from school in the middle of the day and take him with her to lunch and shopping.

Also around this time, defendant began inhaling solvents. Eva once caught defendant and his cousin sniffing glue in his bedroom. She also repeatedly found around the home bottles of glue and bags that had paint sprayed into them so the fumes could be inhaled from the bags. She tried to warn defendant not to inhale solvents because they would affect his brain. Defendant also began using methamphetamine, marijuana, and alcohol.

At the end of eighth grade, defendant was expelled and stopped attending school, but was forced to return after he was placed on probation for the ice cream shop robbery.

In 1990, Tommy Sr. returned to Santa Maria, but was soon placed in prison for two years for fighting and drunk driving. During this period, Tommy Sr. and Eva divorced, and he remarried. While he was in prison, Tommy Sr. and defendant exchanged letters, and defendant confided in his father that he was "getting high." Tommy Sr. counseled him against using drugs, and wanted to get defendant out of Santa Maria because of local gangs.

After the robbery of the liquor store, the juvenile court sent defendant to Los Prietos Boys Camp, the same camp his father had been sent to as an

adolescent. Defendant eventually fled the camp and returned home. His mother sent him to Northern California, where he lived with his uncle Louie for three months. While there, defendant developed an intimate relationship with Louie's stepdaughter. Defendant returned to Santa Maria with Louie's stepdaughter, hoping they would both be able to stay with his mother, but she disapproved of the relationship and notified the authorities, who then brought defendant back to the camp. By then, his brother Isaac had also been sent to the same camp.

Defendant and Isaac fled the camp and stayed at their father's residence in Simi Valley for one day. The next day, Tommy Sr. tried to return them to their mother's residence, but on the way to Santa Maria, Tommy Sr. was stopped and arrested for drunk driving; he served four years in prison as a result.

As the eldest brother, defendant had a very close relationship with his youngest brother, Angel, whom he cared for like a father. Defendant taught Angel how to play baseball, took him bike riding, and picked him up from school. Defendant had similar relationships with his cousins from his uncle Rick's family and had a positive influence on them as well.

During his middle adolescence, ages 15 to 17, defendant had four serious girlfriends. With his mother's permission, at various times, two of them lived at the household and stayed in defendant's room. Defendant's ex-girlfriends all described their relationships with defendant as intimate and loving. Defendant wrote them poetry. None of them experienced any violence from defendant or any abnormal sexual behavior.

(b) *Defendant's mental health*

Dr. Peter Russell, a neuropsychologist, gave defendant a series of standardized tests as part of a neuropsychological evaluation. Before testing defendant, Dr. Russell reviewed his school records, medical records, arrest reports, and other legal records.

On the Wechsler Adult Intelligence Scale, defendant scored an overall IQ of 107, equivalent to the 68th percentile, within the normal range of intelligence. Defendant performed within the normal range in both his immediate verbal and visual memory tests. He also performed exceptionally well on some of his nonverbal visual organizational skills tests and other visual perception and visual memory tests. Dr. Russell's tests showed no indications that any of defendant's memory or sensory functions were impaired.

Dr. Russell's testing, however, revealed a discrepancy between defendant's verbal ability, which tested at the 45th percentile, and his nonverbal ability,

which tested at the 90th percentile. Dr. Russell believed that this discrepancy could reflect a problem with the English language itself, difficulty with language-related reasoning ability, auditory processing problems, or defendant's education level, which was the equivalent of an eighth- or ninth-grade education. He also acknowledged that the discrepancy could be the result of antisocial personality disorder, but did not test defendant for any personality disorders.

Dr. Russell also believed that defendant may have neurological problems because, although he is right handed, he performed finger-tapping tests better with his nondominant left hand. Dr. Russell acknowledged, however, that defendant may have performed poorly on this test because he had previously suffered a dislocated shoulder, an injury that often results in residual nerve impingement.

In addition, defendant performed atypically on the trail-making test, which required him to draw a line connecting randomly distributed circles, first in alphabetical order and then in alphanumeric order. Although defendant made no mistakes, he performed the easier alphabetical ordering slower than normal, and the more difficult alphanumerical ordering at a normal speed. Dr. Russell believed this discrepancy could also indicate neurological problems.

Based on the test results, Dr. Russell believed defendant may have neurological impairment in his anterior frontal lobe, especially the right frontal lobe. According to Dr. Russell, the frontal lobe is the part of the brain important for responsiveness, abstract reasoning, the ability to react to stimuli, and to interpret sensory information from other pathways. People with frontal lobe damage can have difficulty controlling impulses.

Dr. Russell was uncertain as to the cause of defendant's impairment, but noted that defendant's hospital emergency room records reflected he may have suffered head trauma as a result of a fall during a police chase. In addition, he noted that using methamphetamine and inhaling solvents are known to cause neurological damage and that defendant's use of solvents coincided fairly closely with the time he quit going to school.

Dr. Russell acknowledged that defendant's shoulder injury and his poor school performance could have contributed to his lower scores in some verbal and motor skills tests, but he believed these conditions could not explain all of his test results. He also explained that persons with normal IQ scores can still suffer from brain damage because the IQ test is a measure of global functioning and does not target a specific part of the brain. Therefore, Dr. Russell ordered a positron-emission tomography scan, or PET scan,

which is essentially an X-ray imaging of the brain, to see whether defendant's brain functioned abnormally.

Dr. Joseph Wu, clinical director of the Brain Imaging Center and an associate professor in the School of Medicine at the University of California at Irvine, performed a PET scan on defendant. A PET scan is designed to reveal brain functioning in a conscious patient. In a PET scan, the patient is given a radioactive sugar that is designed to be consumed by active portions of the brain. The PET scan can detect different levels of the radioactive sugar as parts of the brain switch from being relatively inactive to active while the patient is asked to perform standardized tasks. In this fashion, the PET scan can present a recorded visual map of brain activity. According to Dr. Wu, although the usefulness of PET scans has been questioned, he believed the medical community now considers PET scans to be an accurate and reliable test of brain function and brain activity that can be useful in evaluating conditions created by inhalant exposure.

In Dr. Wu's opinion, defendant's PET scan revealed brain abnormalities consistent with neurological damage from inhaling solvents. According to Dr. Wu, defendant had an unusually low degree of activity in the front part of his brain—in particular, the parietal lobe area and in his orbital frontal cortex. Consequently, defendant's brain activity was the reverse of a normal functioning pattern, with more activity in the back of his brain. According to Dr. Wu, this reversal can occur as undamaged parts of the brain increase their activity to try to compensate for damaged portions.

Dr. Wu believed that defendant's abnormalities were consistent with frontal lobe syndrome, which can result in poor judgment, inappropriate behavior, and an inability to defer gratification and control inappropriate aggressive impulses. These abnormalities can also result in impulsive decisionmaking without considering long-term consequences. He also believed the abnormalities could result in decreased control or regulation of emotions or aggression as well, but would not hinder the ability to have normal emotions, including compassion.

Dr. Wu thought his findings of brain damage correlated with Dr. Russell's neuropsychological evaluation. Dr. Wu explained that inhaling solvents can dissolve fatty protective tissues in the brain. He noted that exposure to solvents does not necessarily diminish a person's intelligence, but exposure during adolescence would affect the maturation of the frontal lobe, causing problems with impulsivity and poor judgment. The use of marijuana, alcohol, and methamphetamine by a person who also used solvents would further diminish that person's inhibitions and behavioral control. Dr. Wu believed defendant would be able to control his behavior if he were in a highly structured setting like a state prison.

### (c) Adjustment potential

James Esten, a retired correctional consultant, testified that defendant, if sentenced to life without the possibility of parole, would be assigned to a maximum security "level 4" prison.

Esten reviewed defendant's records related to the present case, records from Los Prietos Boys Camp, and interviews of staff at that camp, county jail, and juvenile hall. Esten also interviewed defendant on several occasions in order to assess his maturity level and his ability to function within a maximum security prison setting.

When Esten initially interviewed him, defendant did not believe he could adequately adjust to a long-term prison commitment. But after his trial and conviction, defendant's attitude changed. Esten believed defendant had matured enough to make the changes required for prison life.

In making this assessment, Esten discounted incidents at the Los Prietos Boys Camp where defendant was "mad-dogging" a female camp counselor and drew an inappropriate picture of her being sexually assaulted by a dog. Esten also downplayed an incident in which defendant had conspired with other boys to assault another boy, which resulted in defendant being expelled from the camp. Esten believed that these behaviors reflected defendant's lack of maturity at the time and the need to impress a peer group, but testified that prison inmates tend to warn each other about this type of immature behavior. Esten also downplayed the significance of the plastic eating utensil found in defendant's cell while he awaited trial. Esten did not believe the item should have qualified as a weapon and would have been more concerned if it had been a sharpened piece of metal. Esten was concerned about defendant's past methamphetamine use, which he believed was a factor in the present case, but pointed out that it was not possible for a prison inmate to maintain a methamphetamine habit.

Esten also thought it positive that many of the interviewees in the reports he read could not clearly remember defendant, which suggested defendant blended in and did not stand out in a bad way. On cross-examination, however, Esten acknowledged that defendant had been the subject of numerous disciplinary writeups on almost a daily basis while he was at Los Prietos, and many of the interviewees believed defendant was not trustworthy.

Esten also believed that defendant was intelligent and capable of being productive in prison by completing his high school education, becoming a teacher's aide or clerical assistant, and showcasing his artistic skills, and as a "lifer" might serve as a mentor for younger inmates and exercise a stabilizing

influence in prison culture. He did not believe defendant was interested in joining a prison gang or would succumb to any pressure to join, even though defendant had claimed gang membership as a juvenile.

On cross-examination, Esten acknowledged that until January 1998, lifers were allowed to marry and have conjugal visits, and that such regulations could change again based upon the political leanings of a future state governor. He also acknowledged that prison gangs are a problem and that it is well documented that initiation into a prison gang may require a killing as a rite of passage.

### 3. *Prosecution's Rebuttal*

Workers from the Los Prietos Boys Camp, including Kim Herman, testified about their observations of defendant at the camp. They all characterized defendant as a continuous disciplinary problem due to his disruptive behavior and his refusal to follow staff instructions, particularly those given by female staff members. Defendant was untrustworthy, openly invoked his gang membership, and was an influential ringleader in fostering group defiance and instigating fights.

Herman also provided further details concerning the drawing defendant had made of her and her pet dog, Jack, who lived at the camp. The drawing was of a naked woman on her hands and knees with a dog standing behind her attempting sexual intercourse. A caption read, "Bitch, no wonder you can't get a man. It's cause you are into doggie style and when I say it I mean it. I would give you dick but I will probably catch Jack disease." A caption under that read: "Mrs. Herman, also known as Broadzilla." Herman discovered the drawing after it had been anonymously placed on a staff counter. Defendant admitted he had drawn the picture only after staff threatened to punish the entire group when no one took responsibility. After Herman disciplined defendant, he stared at her intimidatingly, or "mad-dogged" her, on more than one occasion. She also noted defendant did get along with a few other boys, but would intimidate or exert peer pressure on weaker boys.

Richard Diaz was defendant's probation officer for two and a half years. He described defendant as emotionless, often being quiet and "flat." He testified that defendant admitted to using alcohol, marijuana, and methamphetamine, but never mentioned inhaling solvents, and Diaz never saw indications of solvent use. Defendant's family members had made no mention of defendant inhaling solvents.

Diaz believed defendant became a member of the West Park street gang when he was 14 or 15 years old, and went by the gang moniker of "Lonely

Boy." As far as Diaz was aware, defendant never ended his involvement in the gang. While under Diaz's supervision, defendant repeatedly violated the terms and conditions of his probation and was unable to conform to either house arrest or electronic monitoring.

Two correctional officers testified about defendant's behavior in jail pending trial in the present case. They both described him as being unwilling to follow rules and orders, often taking his own time in doing what he was asked.

Dr. David Frecker, a Santa Barbara neurologist, disagreed with Dr. Wu's findings regarding defendant's PET scan. Although he acknowledged he is not as familiar with PET scanning as Dr. Wu, Dr. Frecker believed Dr. Wu had misinterpreted one of the scans by confusing the front portion of defendant's frontal lobe with an area outside defendant's brain, his sinus cavities, where the PET scan would not have detected any activity. Dr. Frecker believed that any other abnormalities in defendant's PET scan were all artifacts created by a misalignment of defendant's head with the scanner.

Dr. Frecker also disagreed with Dr. Wu's "baffling" theory that inhalant use exposes the brain to solvents that could result in demyelinization, the dissolution of fatty protective tissue in the brain. Dr. Frecker testified that inhalant use would damage the brain by depriving it of oxygen only after long-term daily use over several months, or possibly years, and that the damage would be limited to areas of the brain that are sensitive to the lack of oxygen, such as the temporal lobe, which otherwise appeared normal in defendant's case. On cross-examination, however, Dr. Frecker admitted that it is well documented that "a lot" of the brain damage caused by inhaling solvents is the result of demyelinization. He believed that long-term inhalant use typically would cause a person to become docile and withdrawn. He also concluded a PET scan was an unreliable predictor of an individual's behavior because changes in brain functioning are too dynamic to be captured by a single series of PET scans.

### 4. *Defense Surrebuttal*

Based upon two additional reports made while defendant was in the juvenile system, James Esten believed that defendant can become compliant when faced with an "appropriate authority figure"—in particular, a person "who knows how to handle himself and is properly skilled in the handling of minors." Two months prior to his testimony, Esten visited defendant, discussed his disciplinary history, and told defendant "to knock off that kind of shit." After his meeting, defendant remained discipline free during that

period, with the exception of a single incident when he was disciplined for continuous talking in the hallway while awaiting bus transportation. According to Esten, when presented with strong guidelines, defendant has the potential to adjust as a life prisoner without possibility of parole.

Dr. Wu disagreed with Dr. Frecker's assertion that the PET scan image he reviewed showed sinus material, as that would have appeared black on the scan, instead of the blue color that appears. He also reviewed the PET scan technician's notes and did not find any error in the alignment of defendant's skull when the scan was performed. Dr. Wu noted that he had reviewed 30 times as many PET scans as Dr. Frecker and, unlike Dr. Frecker, has published many articles on the subject.

## II. PRETRIAL ISSUES

### A. *Failure to Conduct an Inquiry into Possible Juror Bias*

#### 1. *Factual Background*

During jury selection, Prospective Juror No. 684037, who was later empanelled and selected as foreperson, stated in her juror questionnaire that she was a lead clerk in the Santa Barbara County Probation Department at Santa Maria's juvenile hall and had worked there for 20 years. In her questionnaire, Prospective Juror No. 684037 stated she recognized defendant's name because "he had been at" juvenile hall.

During the initial voir dire of Prospective Juror No. 684037, however, the parties did not question her about her employment or knowledge of defendant. Instead, they focused on her views concerning the death penalty. She stated that if defendant were found guilty of murder and special circumstances, she probably would lean towards the penalty of death before hearing any evidence at a penalty phase. Later, in response to questioning by the court, she said she would be able to follow the law and consider both a life sentence and the death penalty before she reached a verdict in the penalty phase.

Defense counsel challenged Prospective Juror No. 684037 for cause, claiming that she was biased in favor of the death penalty and that she appeared to hesitate when she told the court that she could consider either penalty before reaching a verdict. The trial court denied the challenge.

Later, defense counsel informed the court that he wanted to question Prospective Juror No. 684037 about her knowledge of defendant based upon one of her answers in her juror questionnaire, and the trial court agreed.

When asked, Prospective Juror No. 684037 said it would be difficult for her to serve on the jury because she knew defendant and because of the severity of the charges.

The court then excused the other prospective jurors from the courtroom, so the court could question Prospective Juror No. 684037 confidentially. Prospective Juror No. 684037 explained she was "totally aware" that defendant "had an extensive juvenile record," and indicated she believed defendant had not made good choices in his life. She did not know so much about defendant that it would affect her ability to be impartial, however. Her job at juvenile hall was primarily clerical, and she supervised children while they were waiting for their court interviews. She did not know anything about defendant's family background and, although she must have interacted with defendant while performing her duties at juvenile hall, she did not remember anything specific about him.

Defense counsel again challenged Prospective Juror No. 684037 for cause, arguing that, although it did not appear that she knew the precise nature of defendant's juvenile record, she nonetheless knew that "he did something to get put in juvenile hall, and that's not knowledge that a juror should properly have" for the guilt phase of the trial. The prosecutor argued that Prospective Juror No. 684037 had made clear that her knowledge of defendant would not influence her and that her situation was similar to that of someone who had read about the case in the newspaper, but is able to put that information aside and decide the matter on the evidence presented at trial. The trial court denied the challenge.

The following day, on May 12, 1998, Prospective Juror No. 684037 was sworn in as Juror No. 12, with trial scheduled to begin a week later.

Sometime between May 12 and May 15, 1998, Juror No. 12 had contact with district attorney investigator Tom Barnes. According to a memorandum from Barnes to the prosecutor dated May 15, 1998, Barnes called the Santa Maria juvenile hall in an attempt to locate defendant's juvenile disciplinary reports and spoke with Juror No. 12. Juror No. 12 informed Barnes that, according to her supervisor, Barnes needed a court order to access those reports. Barnes consulted with a deputy district attorney, and, less than 30 minutes after their first conversation, he again called and spoke with Juror No. 12. At that time, Juror No. 12 admitted to Barnes that she was a juror on defendant's case, and Barnes told her that he thought it was "unusual that one side or the other hadn't excused her." According to Barnes's memo, Juror No. 12 "somewhat jokingly, then asked [i]f I could get her off the jury," and Barnes responded he could not, and ended the call. Barnes later called back Juror No. 12 and told her "it would be improper for her to be involved in this

matter any further" and asked to speak with her supervisor. According to Barnes's memo, he was put in contact with another worker for further assistance.

On May 19, 1998, just before opening arguments, the parties discussed Barnes's contact with Juror No. 12 at an in camera proceeding. The prosecutor explained that the contact was inadvertent, as Barnes's aim in calling juvenile hall was to locate defendant's disciplinary reports. Defense counsel agreed the contact was innocent, but expressed concern about Juror No. 12's comment about wanting to get off the jury. Defense counsel asked the court to inquire whether Juror No. 12 was "willing and able and fit for further duty in light of the comment."

The trial court denied the request, reasoning that Juror No. 12's comment merely reflected "a normal desire not to be a juror" and did not relate to her qualifications as a juror. As the trial court put it, if the court required an inquiry of Juror No. 12, "she'd just tell us she doesn't want to be here . . . and so would the [other] 14, 13 [jurors], if we could ask them."

Juror No. 12 later became the foreperson during the guilt phase jury deliberations.

Defendant claims that the trial court abused its discretion by failing to conduct an inquiry into Juror No. 12's contact with Barnes and that this alleged error resulted in a biased juror sitting on his case, thereby prejudicially influencing his guilt and penalty phase verdicts. Defendant further argues that, based upon her voir dire, the court was already "on notice" that Juror No. 12's competency was in doubt and that Barnes's declaration, therefore, triggered a duty to conduct an inquiry. He argues this failure undermined his right to due process and a fair and reliable sentencing determination by an impartial jury, in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and article I, sections 7, 16, and 17 of the California Constitution.

### 2. *Analysis*

■ Section 1089 provides in part: "If at any time . . . a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, or if a juror requests a discharge and good cause appears therefor, the court may order the juror to be discharged . . . ." In construing this statute, we have held that " '[o]nce a trial court is put on notice that good cause to discharge a juror may exist, it is the court's duty "to make whatever inquiry is reasonably necessary" to determine whether the juror should be discharged.' " (*People v. Leonard* (2007) 40 Cal.4th 1370,

1409 [58 Cal.Rptr.3d 368, 157 P.3d 973], quoting *People v. Espinoza* (1992) 3 Cal.4th 806, 821 [12 Cal.Rptr.2d 682, 838 P.2d 204]; see also *People v. Burgener* (1986) 41 Cal.3d 505, 520 [224 Cal.Rptr. 112, 714 P.2d 1251], overruled on other grounds in *People v. Reyes* (1998) 19 Cal.4th 743, 753 [80 Cal.Rptr.2d 734, 968 P.2d 445].)

"But not every incident involving a juror's conduct requires or warrants further investigation. 'The decision whether to investigate the possibility of juror bias, incompetence, or misconduct—like the ultimate decision to retain or discharge a juror—rests within the sound discretion of the trial court.' " (*People v. Cleveland* (2001) 25 Cal.4th 466, 478 [106 Cal.Rptr.2d 313, 21 P.3d 1225], quoting *People v. Ray* (1996) 13 Cal.4th 313, 343 [52 Cal.Rptr.2d 296, 914 P.2d 846].) " '[A] hearing is required only where the court possesses information which, if proven to be true, would constitute "good cause" to doubt a juror's ability to perform his duties and would justify his removal from the case.' " (*Ibid.*)

Defendant complains a hearing was necessary in order to determine whether Juror No. 12 wanted to get off the jury due to her knowledge that defendant had a juvenile record, her belief that he had made poor choices, or the severity of the charges. Defendant argues these factors also may have caused her to question whether she could remain an impartial juror, and thus caused her to ask Barnes for assistance in being removed from the case.[5]

We disagree. The mere fact that Barnes contacted Juror No. 12 does not, by itself, constitute "good cause" that cast doubt on her ability to serve as a juror. Barnes did not give Juror No. 12 any additional information about defendant's case, and the contact was inadvertent. "The court does not abuse its discretion simply because it fails to investigate any and all new information obtained about a juror during trial." (*People v. Ray, supra,* 13 Cal.4th 313, 343.)

Moreover, the areas into which defendant claims the court should have investigated either had already been covered during the voir dire of Juror

---

[5] In support of this claim, defendant also discusses in detail the fact that the trial court did conduct an inquiry as to another juror, Juror No. 6. But the court's handling of Juror No. 6 is distinguishable from the situation presented by Juror No. 12. According to a police report, Juror No. 6 told a police officer that she had received a harassing phone call and believed it may have been connected to defendant's case as an attempt to intimidate her. The court conducted an inquiry, and it appeared that the phone call was unrelated to defendant's case. At the hearing, Juror No. 6 explained that she thought it would not affect her impartiality. Given that the police report stated Juror No. 6 believed the call was intimidating and related to the instant case, this was clearly the kind of matter that would affect a juror's impartiality, and " 'once a juror's competence is called into question, a hearing to determine the facts is clearly contemplated.' " (*People v. Sanders* (1995) 11 Cal.4th 475, 540 [46 Cal.Rptr.2d 751, 905 P.2d 420].)

No. 12 or simply were not relevant to her ability to be impartial. During voir dire, she explained that her contact with defendant had been limited and unremarkable and that she had no knowledge of him that would interfere with her ability to be fair and impartial. The fact that she regarded the charges as severe is unremarkable considering the nature of the case and given that, at the time, Santa Maria had not had a death penalty prosecution in 10 years. Nothing in her statements to Barnes implied her beliefs had changed since the parties questioned her during voir dire. Instead, she merely made a light-hearted inquiry as to whether she could be removed from jury service.

Defendant also argues the trial court should have conducted an inquiry because Barnes's contact with Juror No. 12 may have reinforced her knowledge of defendant's juvenile record. But defendant did not raise this issue before the trial court. Instead, he only questioned why she had expressed the desire to get off the jury—a desire, as the trial court correctly pointed out, that any juror might possess.

Even if defendant had preserved this issue, the claim would lack merit, as does his claim that the trial court was "duty bound" to conduct an inquiry, because defendant fails to present evidence of actual bias on the part of the juror. " 'Before an appellate court will find error in failing to excuse a seated juror, the juror's inability to perform a juror's functions must be shown by the record to be a "demonstrable reality." The court will not presume bias, and will uphold the trial court's exercise of discretion on whether a seated juror should be discharged for good cause under section 1089 if supported by substantial evidence.' " (*People v. Jablonski* (2006) 37 Cal.4th 774, 807 [38 Cal.Rptr.3d 98, 126 P.3d 938], quoting *People v. Holt* (1997) 15 Cal.4th 619, 659 [63 Cal.Rptr.2d 782, 937 P.2d 213].) The record before us does not show that Juror No. 12's interaction with Barnes caused her to learn more about defendant's juvenile record. Therefore, defendant fails to show that she was unable to fulfill her functions as a juror. (*Jablonski*, at p. 807.) Accordingly, we find no prejudice in the trial court's decision not to investigate further and to retain Juror No. 12.[6]

### B. *The Admissibility of Defendant's Confessions*

Before trial, defendant filed a motion challenging the admissibility of his statements to police under *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602] (*Miranda*), and the prosecution opposed the motion. The trial court held an evidentiary hearing, heard arguments, and

---

[6] Since we find no violation of section 1089, a statute that we have previously held is consistent with state and federal constitutional proscriptions, our conclusion also necessarily disposes of defendant's state and federal constitutional claims. (*People v. Leonard, supra,* 40 Cal.4th 1370, 1410.)

ultimately rejected defendant's *Miranda* claims. He renews these arguments on appeal, claiming that (1) he invoked the right to remain silent on the night of his arrest, and the police failed to honor that right by questioning him the following morning; (2) he again invoked the right to remain silent during police questioning that morning, and the police failed to honor that right by questioning him later that day; and (3) he invoked the right to counsel later that same evening, and the police failed to honor that right. We conclude the trial court properly rejected these contentions.

### 1. *Factual Background*

In determining the admissibility of defendant's statements to police, the parties presented the following evidence:

On the night of December 4, 1996, after defendant assaulted Sabrina P. and she positively identified him as her attacker, Santa Maria Police Officer Jeff Lopez arrested defendant and transported him to the police station.

In an interview room, Officer Lopez advised defendant of his *Miranda* rights. Defendant said he understood his rights and was willing to talk with Officer Lopez. Officer Lopez questioned defendant about Sabrina P.'s assault, but defendant denied any involvement. Officer Lopez pointed out inconsistencies in defendant's story. After about 10 minutes, Officer Lopez asked defendant why Sabrina would accuse him of an assault, and defendant responded, "That's all I can tell you." Officer Lopez then ended the interrogation.

The following morning, about 10:00 a.m., Detectives Gregory Carroll and Mike Aguillon spoke with defendant in a police interview room. The interrogation was tape-recorded. Before the interrogation, Detective Carroll was aware that Officer Lopez had read defendant his *Miranda* rights and that defendant had waived them. Detective Carroll, however, was unaware that defendant had said, "That's all I can tell you" at the end of Officer Lopez's interrogation.

At the beginning of the interrogation, Detective Carroll asked defendant if he remembered "the officer who read you your rights last night," and defendant replied, "Yeah." Detective Carroll then asked if he remembered "those rights and do you still understand them and everything?" Defendant again replied, "Yeah." Detective Carroll asked defendant if he still wanted to talk with the detectives, and defendant answered, "Yeah."

The detectives then briefly questioned defendant about Sabrina's assault before taking a short break so they could compare the recording of defendant's voice with the 911 call recording of the man who reported the assault of

Sophia Torres. After the detectives returned to the interview room, they began questioning defendant about Sophia's murder.

Defendant admitted making the 911 call but denied killing Sophia, instead claiming he saw two Black women attacking her as he was meeting her to buy methamphetamine. Toward the end of the interrogation, the detectives pointed out the inconsistencies in defendant's version of events. Detective Aguillon asked defendant to "think about it" and told him, "We'll let you take a break here now."

As everyone stood and prepared to leave, the tape recorder was turned off. Defendant then said, "I don't want to talk anymore right now." Detective Carroll said that was fine, they were going to take a break. He again suggested defendant should "think about it," and said they would return to talk with him. According to Detective Carroll, defendant responded, "Okay."

Later that afternoon, about 5:00 p.m., Detectives Carroll and Aguillon returned to pick up defendant and execute a search warrant by bringing him to the community hospital for a sexual assault response team (SART) exam. As they drove to the hospital, Detective Carroll asked defendant if he had been thinking about their earlier conversation, and defendant replied, "Not really." The detectives then asked defendant to repeat his version of what he saw on the night of Sophia's murder, and defendant again claimed he saw two women attacking Sophia.

After the SART exam, the detectives returned defendant to the police station, where they again brought him to an interview room for an interrogation. This interrogation was partially tape-recorded.[7] The detectives again went over defendant's version of events on the night of Sophia's murder and confronted him with the fact that both Maria M. and Laura Z. had identified him as their attackers in photo lineups earlier that day. During the interrogation, which lasted 30 to 45 minutes, the detectives repeatedly told defendant they did not believe his story about Sophia being attacked by two women. But defendant did not change his story.

At the end of the interrogation, Detective Carroll told defendant to think it over and, as the detectives got up to leave, Detective Aguillon asked defendant if he was willing to take a polygraph examination. Detective Aguillon said he could have someone there in five minutes to administer the examination. Defendant replied, "I think I should talk to a lawyer before I decide to take a polygraph."

The detectives did not ask defendant about the case again until the following morning, December 6, 1996, about 9:00 a.m. The detectives

---

[7] The tape ran out before the end of the interrogation.

approached defendant in his holding cell and asked if he would mind if they talked to him. Defendant replied "No" and shrugged his shoulders. During the subsequent conversation, defendant admitted assaulting both Sabrina P. and Maria M., but denied any involvement in the incident involving Laura Z.

The prosecutor also presented evidence that defendant had previously waived his *Miranda* rights on three different occasions when he was arrested as a juvenile. When Officer Jorge Lievanos arrested defendant as an adult for the assaults he committed on April 2, 1996, however, he initially waived his *Miranda* rights, but later invoked his right to remain silent by saying, "I have nothing more to say."

In the trial court, defendant challenged the admissibility of his statements under *Miranda* and the Fifth, Sixth, and Fourteenth Amendments. Specifically, defendant argued he invoked his right to remain silent at the end of Officer Lopez's interrogation when he said, "That's all I can tell you." Defendant argued that his right to remain silent was not honored when Detectives Carroll and Aguillon interrogated him the following morning. Defendant further argued he invoked his right to remain silent a second time when, at the end of the first interrogation by Detectives Carroll and Aguillon, he said, "I don't want to talk anymore right now," and the detectives failed to honor that invocation by questioning him again later that day. Finally, defendant argued he invoked his right to counsel during the second partially recorded interrogation later that same night when he stated, "I think I should talk to a lawyer before I decide to take a polygraph."

After a hearing, the trial court rejected defendant's arguments. The court concluded that defendant's statement to Officer Lopez was not an attempt to invoke the right to remain silent, but was merely defendant's way of saying he was "sticking to" his version of events regarding Sabrina's assault. The court concluded that defendant's statement to Detectives Carroll and Aguillon about his desire not to "talk about it anymore right now" was simply an expression of the desire not to discuss the matter at the moment and was not intended as a bar to later questioning. Finally, the court concluded that defendant, in discussing the polygraph examination, was only conditioning his invocation of the right to counsel on whether he was going to take the exam—a condition that was never satisfied.[8]

---

[8] In ruling on defendant's *Miranda* claims, the trial court quoted defendant as having said, "I don't want to talk about it anymore right now," and "I think I need to talk to my lawyer before I take a polygraph." These quotations differ slightly from the quotations Detective Carroll reported at the *Miranda* hearing. Since Detective Carroll quoted defendant's statements using notes he took at the time of defendant's questioning, we rely on his version of defendant's statements. In any case, these minor discrepencies do not undermine the validity of the trial court's ruling.

Defendant renews these same arguments on appeal. We conclude the trial court properly rejected defendant's arguments and did not err in admitting all of his statements at trial.

### 2. *Applicable Law*

■ As a prophylactic safeguard to protect a suspect's Fifth Amendment privilege against self-incrimination, the United States Supreme Court, in *Miranda*, required law enforcement agencies to advise a suspect, before any custodial law enforcement questioning, that "he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." (*Miranda, supra*, 384 U.S. 436, 479; see *Connecticut v. Barrett* (1987) 479 U.S. 523, 528 [93 L.Ed.2d 920, 107 S.Ct. 828].) If the suspect knowingly and intelligently waives these rights, law enforcement may interrogate, but if at any point in the interview he invokes the right to remain silent or the right to counsel, "the interrogation must cease." (*Miranda*, at p. 474; see *id.* at pp. 444–445, 473–475, 479.)

■ In *Davis v. U.S.* (1994) 512 U.S. 452 [129 L.Ed.2d 362, 114 S.Ct. 2350] (*Davis*), the United States Supreme Court explained that to invoke the *right to counsel* during an interrogation, a suspect must "articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." (*Id.* at p. 459.) "If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." (*Id.* at pp. 461–462.) Although "when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney," the high court specifically declined to adopt a "stop and clarify" rule that would require officers to ask clarifying questions about whether the right was being invoked. (*Id.* at p. 461.)

In the absence of any contrary authority from the high court, we have also applied *Davis*'s articulation standard to ambiguous statements made in the context of a suspect's invocation of the right to remain silent.[9] As we stated

---

[9] A plurality of state courts, and at least five of the 11 federal circuit courts, have specifically applied *Davis* to invocations of the right to remain silent. (*McGraw v. Holland* (6th Cir. 2001) 257 F.3d 513, 519; *U.S. v. Banks* (7th Cir. 1996) 78 F.3d 1190, 1197; *U.S. v. Johnson* (8th Cir. 1995) 56 F.3d 947, 955; *U.S. v. Nelson* (10th Cir. 2006) 450 F.3d 1201, 1211–1212; *Coleman v. Singletary* (11th Cir. 1994) 30 F.3d 1420, 1424; *Bowen v. State* (1995) 322 Ark. 483 [911 S.W.2d 555, 565]; *People v. Arroyo* (Colo. 1999) 988 P.2d 1124, 1131; *Owen v. State* (Fla. 2003) 862 So.2d 687, 692; *State v. Law* (2002) 136 Idaho 721, 724–725 [39 P.3d 661]; *State v.*

in *People v. Stitely* (2005) 35 Cal.4th 514, 535 [26 Cal.Rptr.3d 1, 108 P.3d 182], "[i]n order to invoke the Fifth Amendment privilege after it has been waived, and in order to halt police questioning after it has begun, the suspect 'must *unambiguously*' assert his right to silence . . . ." (See also *People v. Rundle* (2008) 43 Cal.4th 76, 114 [74 Cal.Rptr.3d 454, 180 P.3d 224].) In addition, we also concluded that the "stop and clarify" rule does not apply to ambiguous assertions of the right to silence. "Faced with an ambiguous or equivocal statement, law enforcement officers are not required . . . either to ask clarifying questions or to cease questioning altogether." (*People v. Stitely, supra,* 35 Cal.4th at p. 535; see also *People v. Rundle, supra,* 43 Cal.4th 76, 115.)[10]

Defendant argues that we should distinguish the right to silence from the right to counsel at issue in *Davis*, and at the very least we should require the police to stop and clarify ambiguous invocations of the right to silence. He contends that the stop and clarify rule should apply to the right to remain silent because it is the core right *Miranda* sought to protect, unlike the right to counsel, which is only a "second layer" *Miranda* protection. We disagree.

*Robertson* (La. 1998) 712 So.2d 8, 29; *People v. Granderson* (1995) 212 Mich.App. 673 [538 N.W.2d 471, 474]; *State v. Golphin* (2000) 352 N.C. 364 [533 S.E.2d 168, 225]; *State v. Greybull* (1998) 1998 ND 102 [579 N.W.2d 161, 163]; *State v. Murphy* (2001) 91 Ohio St. 3d 516 [2001 Ohio 112, 747 N.E.2d 765, 778–779]; *State v. Reed* (1998) 332 S.C. 35 [503 S.E.2d 747, 750]; *Dowthitt v. State* (Tex.Crim.App. 1996) 931 S.W.2d 244, 257; *State v. Bacon* (1995) 163 Vt. 279 [658 A.2d 54, 65]; *State v. Hodges* (2003) 118 Wn.App. 668 [77 P.3d 375]; *State v. Ross* (Ct.App. 1996) 203 Wis.2d 66, 75–78 [552 N.W.2d 428].) A significant number of state courts, and at least five of the 11 federal circuits, have taken pains to avoid deciding the issue in the absence of a decision by the high court. (*James v. Marshall* (1st Cir. 2003) 322 F.3d 103, 108; *U.S. v. Ramirez* (2d Cir. 1996) 79 F.3d 298, 305; *Burket v. Angelone* (4th Cir. 2000) 208 F.3d 172; *Soffar v. Cockrell* (5th Cir. 2002) 300 F.3d 588, 594, fn. 5; *DeWeaver v. Runnels* (9th Cir. 2009) 556 F.3d 995, 1001 [noting that the Ninth Circuit has repeatedly declined to decide the issue in previous cases]; *Munson v. State* (Alaska 2005) 123 P.3d 1042, 1047; *Green v. State* (2002) 275 Ga. 569 [570 S.E.2d 207, 209–210]; *Commonwealth v. Sicari* (2001) 434 Mass. 732 [752 N.E.2d 684, 696, fn. 13]; *Pena v. State* (2004) 2004 WY 115 [98 P.3d 857, 868].) Some states have specifically refused to apply *Davis* to invocations of the right to remain silent. (*State v. Strayhand* (1995) 184 Ariz. 571 [911 P.2d 577, 592]; *Freeman v. State* (2004) 158 Md.App. 402 [857 A.2d 557, 570] [refusing to apply *Davis* to an initial waiver of rights]; *State v. Holloway* (2000) 2000 ME 172 [760 A.2d 223, 228] [same].) Other courts have continued to require law enforcement to stop and clarify ambiguous assertions of the right to silence. (*Freeman v. State* (Ala.Crim.App. 1999) 776 So.2d 160, 175; *Garvey v. State* (Del. 2005) 873 A.2d 291, 296; *State v. Tiedemann* (2007) 2007 UT 49 [162 P.3d 1106, 1111]; *State v. Farley* (1994) 192 W.Va. 247 [452 S.E.2d 50, 59, fn. 12].) Still another group of courts requires the unambiguous assertion of the right to remain silent, without making specific reference to *Davis*. (*State v. Holmes* (2004) 278 Kan. 603 [102 P.3d 406, 419]; *Soto v. Commonwealth* (Ky. 2004) 139 S.W.3d 827, 847; *People v. Brandon* (N.Y.Crim.Ct. 2003) 1 Misc.3d 618 [770 N.Y.S.2d 825, 831]; *Midkiff v. Commonwealth* (1995) 250 Va. 262 [462 S.E.2d 112, 115].)

[10] We disapprove of any language to the contrary in *People v. Box* (2000) 23 Cal.4th 1153, 1194 [99 Cal.Rptr.2d 69, 5 P.3d 130].

■ Applying different rules to invocations of the right to counsel and the right to remain silent would be difficult for law enforcement officials to implement in the interrogation setting, especially where the suspect's ambiguous statements may relate to both the right to counsel and the right to remain silent. (See *Johnson v. Harkleroad* (4th Cir. 2004) 104 Fed. Appx. 858, 867 [suspect stated, " 'maybe I should stop talking and get a lawyer' "]; *U.S. v. Cheely* (9th Cir. 1994) 36 F.3d 1439, 1447 [suspect, when asked whether he wished to waive his *Miranda* rights, stated " 'he didn't think his attorney would want him talking to us . . .' "].) The police would not be required to clarify whether the suspect sought the assistance of counsel, but would be required to clarify whether the suspect sought to remain silent. Therefore, although the right to silence is the core right protected by *Miranda*, as *Davis* itself noted, "we must consider the other side of the *Miranda* equation: the need for effective law enforcement." (*Davis, supra,* 512 U.S. at p. 461.) Applying the same rule to both the right to remain silent and the right to counsel provides a "bright line that can be applied by officers in the real world of investigation and interrogation without unduly hampering the gathering of information." (*Ibid.*)

With these principles in mind, we now examine defendant's *Miranda* claims.

### 3. *Analysis*

As noted, defendant claims that he invoked his right to silence with Officer Lopez and again the following morning with Detectives Carroll and Aguillon. He also claims he invoked his right to counsel later that same day.

"In reviewing *Miranda* issues on appeal, we accept the trial court's resolution of disputed facts and inferences as well as its evaluations of credibility if substantially supported, but independently determine from undisputed facts and facts found by the trial court whether the challenged statement was legally obtained." (*People v. Smith* (2007) 40 Cal.4th 483, 502 [54 Cal.Rptr.3d 245, 150 P.3d 1224].)

#### (a) *Defendant's Statements to Detectives Carroll and Aguillon on the Morning of December 5, 1996*

Defendant argues he invoked his right to silence when he told Officer Lopez, "That's all I can tell you," and that, as a result, Detectives Carroll and Aguillon improperly questioned him the following morning. We disagree.

In very similar circumstances, in *In re Joe R.* (1980) 27 Cal.3d 496 [165 Cal.Rptr. 837, 612 P.2d 927], we concluded that a defendant's use of the

phrase "That's all I have to say" was not an attempt to end the interrogation and that "[i]t was not unreasonable for the [trial] court to endorse the prosecutor's inference that what defendant was saying was, That's my story, and I'll stick with it." (*Id.* at p. 516.)

In the present case, we agree with the trial court's conclusion, supported by Officer Lopez's testimony, that he believed defendant was telling him "[t]hat's all the information he had for me." But even assuming defendant made a sufficiently clear invocation under *Davis*, which *In re Joe R.* predates, there was no error. Officer Lopez stopped the interrogation, did not try to persuade defendant to talk, and obtained no further statements from him.

Moreover, under the principles of *Michigan v. Mosley* (1975) 423 U.S. 96 [46 L.Ed.2d 313, 96 S.Ct. 321], defendant's interrogation the following morning by Detectives Carroll and Aguillon also complied with *Miranda*. In *Mosley*, despite the defendant's invocation of the right to remain silent, the high court declined to find a *Miranda* violation because "the police here immediately ceased the interrogation, resumed questioning only after the passage of a significant period of time and the provision of a fresh set of warnings, and restricted the second interrogation to a crime that had not been a subject of the earlier interrogation." (*Michigan v. Mosley, supra*, 423 U.S. at p. 106.) In *Mosley*, the time elapsed between the invocation of the right to silence and the reinterrogation was "more than two hours." (*Id.* at p. 104.)

The present case is factually similar. Here, the detectives waited overnight to approach defendant again, and their questioning shifted quickly from Sabrina P.'s assault to a different crime, Sophia's murder. Although the detectives did not reread defendant his *Miranda* rights verbatim, they did remind him of the admonition given the night before and then specifically asked him if he remembered those rights and whether he still wanted to talk. Defendant responded affirmatively. Given that defendant had been read his *Miranda* rights the night before and on at least four prior occasions, the record fails to support any inference that defendant was unaware of his rights and the significance of his waiver. (*People v. Riva* (2003) 112 Cal.App.4th 981, 994 [5 Cal.Rptr.3d 649]; see also *Weeks v. Angelone* (4th Cir. 1999) 176 F.3d 249, 268 [*Mosley* was complied with where the officer asked the defendant "whether he remembered the rights he had been read from the first interrogation"]; *U.S. v. Andrade* (1st Cir. 1998) 135 F.3d 104, 106–107 [same].)

> (b) *Defendant's Statements to Detectives Carroll and Aguillon on the Afternoon of December 5, 1996*

Defendant also argues he invoked his right to silence when, at the end of the interrogation on the morning of December 5, 1996, he told Detectives

Carroll and Aguillon, "I don't want to talk anymore right now." Defendant argues that this statement was a clear invocation of that right, especially given the context in which it was made—with no question pending, after the detectives had confronted him with inconsistencies in his version of events, told him to think it over, announced that they were taking a break, and were beginning to leave the room. He argues, therefore, that the detectives improperly reapproached him and questioned him later that afternoon. We disagree.

Defendant relies heavily on *People v. Peracchi* (2001) 86 Cal.App.4th 353, 361 [102 Cal.Rptr.2d 921], a Court of Appeal decision concluding that the defendant's use of the phrase "I don't want to discuss it right now," was a refusal to *waive* his right to remain silent. In *Peracchi*, after the officer read the defendant his *Miranda* rights and asked the defendant whether he wanted to talk, the defendant responded, "At this point, I don't think so. At this point, I don't think I can talk." When the officer tried to clarify, the defendant explained that his head was "not clear enough" to discuss the charges against him "right now." When the officer again tried to clarify, the defendant said, "I don't want to discuss it right now." The officer asked why, and the defendant then made statements incriminating himself. (*Peracchi*, at pp. 358–359.) The *Peracchi* court concluded that the officer's first attempts to clarify the defendant's statements were proper, but once the defendant stated, " 'I don't want to discuss it right now,' " he was "clearly indicating that he intended to invoke his right to remain silent" and the officer thereafter improperly continued to interrogate because "[o]fficers have no legitimate need or reason to inquire into the reasons why a suspect wishes to remain silent." (*Id.* at p. 361.)

■ Although defendant's statement here is similar to the one uttered in *Peracchi*, the context in which it was uttered is markedly different. *Peracchi* involved a *Miranda waiver*, not an *invocation* during the course of an interrogation. "Invocation and waiver are entirely distinct inquiries, and the two must not be blurred by merging them together." (*Smith v. Illinois* (1984) 469 U.S. 91, 98 [83 L.Ed.2d 488, 105 S.Ct. 490].) The defendant in *Peracchi* invoked his right to silence at the outset of the interrogation, making clear he did not wish to waive his right to silence at that time. Defendant in the present case made the statement after a lengthy interrogation session and after the detective made clear that the session was over. The resumption of questioning later that day did not, as in *Peracchi*, amount to a failure to heed a suspect's clear refusal to waive his right to silence.

In any event, even though he was not required to do so, Detective Carroll employed "good police practice" by clarifying any ambiguity when he responded to defendant's statement by saying that was "fine," that they were

going to take a break, encouraged him to "think about it," and said that they would come back and talk to him. (*Davis, supra,* 512 U.S. at p. 461.) Defendant could have responded negatively and explained that he would not be interested in talking further, even after a break. He did not. Instead, by saying, "Okay," he in effect agreed to allow the detectives to return for more questioning.

For the same reason, defendant's claim that he reiterated his previously invoked right to remain silent hours later as they drove to the hospital must also fail. As explained, Detective Carroll asked defendant if he had been thinking about their earlier conversation, and defendant replied, "Not really." Detective Carroll had already elicited the clarification that defendant was willing to discuss the matter after a break, and that wish had been honored. At this point, defendant was merely indicating that he had "not really" thought about changing his version of events and that, as he had previously told Officer Lopez, he was sticking to his story.

(c) *Defendant's Statements About Taking a Polygraph*

Defendant claims that at the end of his last interrogation on December 5, 1996, his statement, "I think I should talk to a lawyer before I decide to take a polygraph," was a clear invocation of his right to counsel, made in response to Detective Aguillon's offer to provide a polygraph examination. We disagree.

As we have held, a defendant does not unambiguously invoke his right to counsel when he makes that request contingent on an event that has not occurred. (See *People v. Gonzalez* (2005) 34 Cal.4th 1111 [23 Cal.Rptr.3d 295, 104 P.3d 98] [defendant's request for counsel was conditioned on whether he was going to be charged with any crimes].)

In the present case, defendant's statement was conditional—"I think I should talk to a lawyer *before* I decide to take a polygraph." (Italics added.)[11] Under these circumstances, the detectives reasonably could conclude that defendant only wanted the assistance of counsel if he was taking a polygraph exam. Since no polygraph exam was administered, defendant did not need the assistance of counsel, and the detectives, under *Davis, supra,* 512 U.S. 452, were not obligated to inquire further at that point or when they approached him again the following morning.

---

[11] Defendant also argues that his use of the words "I think" did not render his statement ambiguous or equivocal and, in his reply brief, cites several lower federal court decisions indicating differing views as to whether those same words render a request for counsel insufficient under the *Davis* "unambiguous or unequivocal" language test. We need not discuss this issue in light of our conclusion that his request for counsel was conditional.

■ Accordingly, defendant's *Miranda* claims lack merit, and the trial court did not err in admitting his statements at trial.

## III. GUILT PHASE ISSUES

### A. *Instructional Error As to Issues of Consent*

Defendant argues the trial court prejudicially erred by refusing his request to give the jury two instructions involving consent as a defense to the crime of rape: CALJIC No. 1.23.1,[12] which defines consent as a defense to rape, and CALJIC No. 10.65,[13] which instructs the jury that a reasonable mistaken belief as to consent constitutes a defense to the crime of rape. He further argues the remaining instructions given to the jury insufficiently defined the defense of consent in violation of his state and federal constitutional rights to due process, trial by jury, to present a defense, and to fair and reliable capital guilt and penalty phase trials. We disagree.

■ In criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case. (*People v. Breverman* (1998) 19 Cal.4th 142, 154 [77 Cal.Rptr.2d 870, 960 P.2d 1094].) "A trial court's duty to instruct, sua sponte, on particular defenses arises ' "only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case." ' " (*People v. Maury* (2003) 30 Cal.4th 342, 424 [133 Cal.Rptr.2d 561, 68 P.3d 1].)

■ In refusing defendant's request, the trial court correctly concluded that CALJIC No. 10.65 was not supported by the evidence. CALJIC No. 10.65

---

[12] Defendant's proposed CALJIC No. 1.23.1 instruction defined "consent" as follows: "In [prosecutions under] Penal Code section 261, the word 'consent' means positive cooperation in an act or attitude as an exercise of free will. The person must act freely and voluntarily and have knowledge of the nature of the act or transaction involved."

[13] Defendant's proposed CALJIC No. 10.65 instruction defined "belief as to consent" as follows:

"In the crime of [unlawful] [forcible rape] by force [*sic*], [violence] [fear] [or] [threats to retaliate] [*sic*], criminal intent must exist at the time of the commission of the rape. There is no criminal intent if the defendant had a reasonable and good faith belief that the other person voluntarily consented to engage in [sexual intercourse] of [*sic*][.]

"Therefore, a reasonable and good faith belief that there was voluntary consent is a defense to such a charge.

"[However, a belief that is based upon ambiguous conduct by an alleged victim that is the product of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another is not a reasonable good faith belief.]

"If after a consideration of all of the evidence you have a reasonable doubt that the defendant had criminal intent at the time of the [sexual intercourse] you must find [him] [her] not guilty of the crime."

is based upon our decision in *People v. Mayberry* (1975) 15 Cal.3d 143 [125 Cal.Rptr. 745, 542 P.2d 1337], which held that a defendant's reasonable and good faith mistake of fact regarding a person's consent to sexual intercourse is a defense to rape because it negates the wrongful intent required for the crime. (*Id.* at p. 155.) In *People v. Williams* (1992) 4 Cal.4th 354 [14 Cal.Rptr.2d 441, 841 P.2d 961], we clarified when the instruction is required. We explained that, in order for the *Mayberry* defense to apply, the defendant must have "honestly and in good faith, albeit mistakenly, believed that the victim consented to sexual intercourse" based upon "evidence of the victim's equivocal conduct," and "the defendant's mistake regarding consent [must have been] reasonable under the circumstances." (*People v. Williams, supra,* 4 Cal.4th at pp. 360–361.) "Thus, because the *Mayberry* instruction is premised on mistake of fact, the instruction should not be given absent substantial evidence of equivocal conduct that would have led a defendant to reasonably and in good faith believe consent existed where it did not." (*Id.* at p. 362.)

Here, as the trial court noted, the record is devoid of any equivocal conduct on the part of Sophia Torres, or of any evidence that defendant reasonably mistook her conduct for consent. In fact, defendant claimed that he had only met her for the first time that night and that, other than observing her being chased by two women, he had no contact with her at the park where she was found dead. He claimed that he was only meeting her to buy methamphetamine and otherwise never did drugs with or "partied with her." Therefore, without evidence of Sophia's equivocal conduct or that defendant reasonably mistook her conduct for consent, the record provided no support for the instruction.

The reasons for the trial court's refusal to give CALJIC No. 1.23.1 are less clear. After declining to give CALJIC No. 10.65, the court inquired about CALJIC No. 1.23.1, and defense counsel explained that it defined consent, but then stated, "I've just realized that that instruction probably has meaning if you give 10.65, which the court has refused." The court then stated that it would refuse the instruction, and defense counsel stated, "It's an accurate statement of the law, and I still want it, but that's because I still want 10.65." The trial court then refused the instruction.

Further complicating matters, the prosecutor had earlier suggested that defense counsel was "entitled to argue, if he wants to, that they had consensual sex," and at closing arguments both sides argued the issue of whether defendant and Sophia had consensual sex on the night of the crimes. Additionally, defendant relies on the testimony of Dr. Robert Failing, the state's pathologist, who found no bruising, tearing, or trauma to the victim's vagina, although he also testified that this finding was not necessarily inconsistent with a sexual assault.

We need not decide whether this evidence or counsel's arguments required the trial court to supply CALJIC No. 1.23.1's definition of consent because any error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824].)

 The trial court instructed the jury with CALJIC No. 10.00, defining the crime of rape. The instruction makes clear that the acts against the victim must occur "against that person's will," which it in turn defines as "without the consent of the alleged victim." Nothing indicates that the jury was confused or required a definition of "consent." In fact, the definition of consent in CALJIC No. 1.23.1 arguably is less beneficial to defendant than its common or ordinary dictionary meaning[14] because it not only requires agreement but also "knowledge of the nature of the act or transaction involved." Therefore, defendant may have benefited from the jury's considering only the plain meaning of the word "consent," as opposed to the definition contained in CALJIC No. 1.23.1. (See *People v. Carapeli* (1988) 201 Cal.App.3d 589, 593–594 [247 Cal.Rptr. 478].) As a result, defendant fails to demonstrate prejudice.

### B. *Prosecutorial Misconduct During Closing Arguments*

Defendant argues that the prosecutor engaged in misconduct during his guilt phase closing arguments by improperly appealing to sympathy, passion and prejudice. He also claims the prosecutor committed misconduct by referring to the subject of punishment and to the penalty phase and by vouching for the credibility of a witness. Defendant claims these various acts of alleged misconduct deprived him of due process of law and violated his Eighth Amendment right to a reliable determination of penalty. We disagree and further conclude that any error was harmless.

#### 1. *The Standard of Review*

Under the federal standard, prosecutorial misconduct that infects the trial with such " 'unfairness as to make the resulting conviction a denial of due process' " is reversible error. (*Darden v. Wainwright* (1986) 477 U.S. 168, 181 [91 L.Ed.2d 144, 106 S.Ct. 2464].) In contrast, under our state law, prosecutorial misconduct is reversible error where the prosecutor uses "deceptive or reprehensible methods to persuade either the court or the jury" (*People v. Price* (1991) 1 Cal.4th 324, 447 [3 Cal.Rptr.2d 106, 821 P.2d 610]) and " 'it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct' " (*People v. Wallace* (2008) 44

---

[14] To "consent" is defined as "to give assent or approval." (Merriam-Webster's Collegiate Dict. (10th ed. 1998) p. 245.)

Cal.4th 1032, 1071 [81 Cal.Rptr.3d 651, 189 P.3d 911]). To preserve a misconduct claim for review on appeal, a defendant must make a timely objection and, unless an admonition would not have cured the harm, ask the trial court to admonish the jury to disregard the prosecutor's improper remarks or conduct. (*People v. Tafoya* (2007) 42 Cal.4th 147, 176 [64 Cal.Rptr.3d 163, 164 P.3d 590].)

### 2. Appeals to Sympathy, Passion, and Prejudice

Defendant argues that the prosecutor appealed to the jury's passion, prejudice, and sympathy by referring to Sophia as "that poor lady," "that poor woman," or as "a very nice woman"; describing her assault as a "savage beating" and expressing incredulity "that one human being could do that to another being"; remarking that any uneasiness the jury might experience in viewing the photographs of her injuries would reflect "a measure of the true violent capabilities of the defendant in this case and the true measure of the suffering of the victim"; and ending his argument by telling the jury that it had the ability through its verdict to "tell everybody in this community" and "everyone" that Sophia was "a nice person," "a gentle person," "a loner" who was "depressed" and "contemplative" because she was mourning "the loss of the person that she loved more than anybody else in life," and "that she was not a promiscuous woman" who "would engage in a one-night stand with the defendant."

Defendant also argues that the prosecutor made similar impassioned statements relating to Maria M. and the other victims in this case by stating "that the memory of each of the victims will always be scarred from their individual suffering and the terror created by" defendant's assaults; remarking on "their looks of discomfort" while having "to face the defendant again" in court; describing "the tears evoked" when Maria testified as to defendant's assault; and by claiming that it was "insulting your intelligence" for defendant to claim that he did not intend to rape Maria.

As defendant acknowledges, defense counsel lodged no objection to these statements. He claims, however, that he was not required to object because of the number and variety of the comments and because they increased in both frequency and severity until the end of the prosecutor's argument, by which time it was it was too late for an objection and admonition to cure the harm. In addition, he notes that defense counsel, in his closing argument, sought to defuse the prosecutor's remarks by characterizing the comments as "hot words, emotional words" and an appeal to "the emotional issues," and by encouraging the jury to set aside those emotions because "that isn't how the law expects you to make your decision."

Assuming, without deciding, that objections were not required under these circumstances, we conclude defendant has not shown that he is entitled to relief. The prosecutor's description of the victim's injuries was not an improper appeal to the jury's passion and prejudice. Prosecuting attorneys are allowed "a wide range of descriptive comment" and their " ' "argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom." ' " (*People v. Williams* (1997) 16 Cal.4th 153, 221 [66 Cal.Rptr.2d 123, 940 P.2d 710], quoting *People v. Wharton* (1991) 53 Cal.3d 522, 567 [280 Cal.Rptr. 631, 809 P.2d 290].) The prosecution's description of Sophia "suffering" a "savage beating" and the comment about how it reflected defendant's "violent capabilities" were fair comments on the evidence. In *People v. Harrison* (2005) 35 Cal.4th 208 [25 Cal.Rptr.3d 224, 106 P.3d 895], in which the defendant killed two people over a sale of fake cocaine by shooting them pointblank in the head, we concluded that the prosecutor at the guilt phase did not exceed the bounds of permissible closing argument by describing the defendant as someone who enjoyed killing like " 'a little kid opening his toys at Christmas' " (*id.* at p. 244) as a " 'denizen of the night,' " as " 'the executioner,' " as " 'the terminator of precious life,' " as " 'a head hunter' " (*id.* at p. 245) and as " 'the complete and total essence of evil' " with " 'a cold unyielding heart' " (*id.* at p. 246). The comments at issue here are far less descriptive given the circumstances of the case.

Even if the prosecutor's argument could be interpreted as an improper appeal for sympathy for Sophia and the other victims, however, it is not reasonably probable that the verdict would have been more favorable to defendant without the misconduct. "We have settled that an appeal to the jury to view the crime through the eyes of the victim is misconduct at the guilt phase of trial; an appeal for sympathy for the victim is out of place during an objective determination of guilt. [Citations.]" (*People v. Stansbury* (1993) 4 Cal.4th 1017, 1057 [17 Cal.Rptr.2d 174, 846 P.2d 756].) The prosecutor's comments about Sophia's character and the impact of defendant's crimes on the other victims were not egregious and were relatively brief compared to the rest of his arguments. They could not, by themselves, have swayed the jury. The evidence that defendant killed Sophia was very strong and generally uncontradicted. Moreover, defense counsel responded effectively to the prosecutor's comments in his closing argument, and the trial court instructed the jury "not to be influenced by pity for or prejudice against defendant," and "not be influenced by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling." We presume the jury followed the court's instruction. (See *People v. Kipp* (2001) 26 Cal.4th 1100, 1130 [113 Cal.Rptr.2d 27, 33 P.3d 450].)

### 3. *References to Punishment and Penalty*

Defendant also argues that the prosecutor improperly raised the subject of punishment and penalty in his guilt phase closing arguments by commenting on the strength of defendant's guilt and then stating, "The simple truth is this trial went quickly and it's a precursor to the second trial in this case." Defendant also claims that the prosecutor injected the issue of punishment into his argument by stating that because defendant continued to stalk women after Sophia's murder he had no "lessons learned in life." According to defendant, this statement implied that defendant could not be rehabilitated. Defendant has forfeited these claims on appeal because he failed to object to either of these statements. (*People v. Saunders* (1993) 5 Cal.4th 580, 589–590 [20 Cal.Rptr.2d 638, 853 P.2d 1093].) In any event, even if defendant had preserved this issue, there was no error.

■■■ At the guilt phase, "[a] defendant's possible punishment is not a proper matter for jury consideration." (*People v. Holt* (1984) 37 Cal.3d 436, 458 [208 Cal.Rptr. 547, 690 P.2d 1207].) But the challenged comments could not have been interpreted to mean that the jury should consider punishment and penalty at the guilt phase. The first was, at best, an opaque reference to the penalty phase and did not attempt to sway the jury towards any particular punishment. The second was simply an observation about defendant's conduct and made no reference whatsoever to penalty.

### 4. *Vouching for the Credibility of a Witness*

Defendant also contends that the prosecutor improperly bolstered Maria M.'s credibility by claiming that her statements were "consistent with police, in prior testimony, and here before you," even though her prior statements were not introduced as evidence. The trial court overruled defendant's objection.

■■■ A prosecutor may comment upon the credibility of witnesses based on facts contained in the record, and any reasonable inferences that can be drawn from them, but may not vouch for the credibility of a witness based on personal belief or by referring to evidence outside the record. (*People v. Turner* (2004) 34 Cal.4th 406, 432–433 [20 Cal.Rptr.3d 182, 99 P.3d 505]; *People v. Gates* (1987) 43 Cal.3d 1168, 1187–1188 [240 Cal.Rptr. 666, 743 P.2d 301].)

Defendant claims he was prejudiced by the error because Maria had made inconsistent statements relevant to the asportation element of the charges involving kidnapping her with intent to commit rape and kidnapping her for robbery. Not so. Even assuming the trial court erred in overruling defendant's objection, the error was not prejudicial.

Maria's inconsistent statements concerned whether she had actually heard the good samaritan, Francisco Lopez, approaching. At trial, she claimed that, when defendant was about to assault her in the alleyway, she did not hear anyone coming, but told defendant that someone was approaching to scare him off. She did not remember previously claiming, to a defense investigator and during her preliminary hearing testimony, that she did hear someone approaching. But this inconsistency is of no consequence because Maria's testimony unequivocally established that defendant had grabbed her, put a knife to her neck, and dragged her by her hair away from the mall walkway and into the alleyway *before* she made the statement about someone approaching. In addition, Francisco Lopez's testimony corroborated Maria's version of how defendant moved her from the mall walkway and toward the alleyway before he startled defendant by activating the siren in his truck. Therefore, the inconsistency concerned a portion of Maria's testimony that was collateral to the evidence supporting the aggravated kidnapping charges, and it is not reasonably probable that any jury confusion on this subject would have affected the outcome of the trial. (See *People v. Rayford* (1994) 9 Cal.4th 1 [36 Cal.Rptr.2d 317, 884 P.2d 1369].)

C. *Cumulative Errors in the Guilt Phase*

Defendant contends that the judgment of conviction must be reversed due to cumulative error.

We have assumed, for the sake of argument, that the trial court erred by failing to instruct the jury on the definition of "consent" for purposes of rape and that the prosecutor's closing argument made an improper appeal for sympathy for the victims. We have also concluded that the trial court erred in overruling defendant's objection to the prosecution's claim, also made during closing argument, that Maria M. had made prior consistent statements. But, as we have noted, defendant has failed to demonstrate prejudice as to any of these claims. Taken together, the cumulative effect of these minor errors and assumed errors did not prejudice defendant.

## IV. PENALTY PHASE ISSUES

A. *Guilt Phase Errors Prejudicially Affecting the Penalty Phase*

Defendant argues that the guilt phase errors "poisoned" the penalty phase, thereby requiring reversal of his death sentence.

We have concluded, however, that any guilt phase errors, whether assumed or actual, and whether considered individually or cumulatively, could not have prejudiced defendant at the guilt phase. Similarly, given that none of

these errors affected the guilt phase, defendant fails to show, under any standard, how these same errors could have affected the penalty phase.

### B. *Victim Impact Evidence*

#### 1. *Improper Testimony*

Defendant next renews the argument he made below that admission of prejudicial victim impact testimony violated his state and federal rights to due process and a fair trial. Specifically, he argues that allowing Sophia's family members to testify regarding how the manner of her death affected them and to allow the surviving victims to testify regarding the impact of defendant's crimes on them violated the Eighth Amendment. (See *Payne v. Tennessee* (1991) 501 U.S. 808, 830, fn. 2 [115 L.Ed.2d 720, 111 S.Ct. 2597] ["the admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence violates the Eighth Amendment"].) We disagree.

#### (a) *Testimony of Sophia's Sister and Brother*

At the penalty phase, the prosecutor asked Sophia's sister, Victoria Francisco, about the impact of Sophia's murder on her. During the course of her answer, Sophia's sister said that what hurt her most was thinking of "all that she went through" and how Sophia "suffered that night" before her death.

After her testimony and outside the jury's presence, defense counsel objected to these statements, claiming that they were improper characterizations by a victim's family member of the nature of the crime in violation of *Booth v. Maryland* (1987) 482 U.S. 496 [96 L.Ed.2d 440, 107 S.Ct. 2529] and *Payne v. Tennessee, supra,* 501 U.S. 808, and in violation of the trial court's pretrial rulings on victim impact testimony. Defense counsel argued that the contested statements were inflammatory and an improper appeal to emotion, and asked the trial court to instruct the prosecution not to present this kind of evidence. The trial court overruled the objection, concluding the testimony was permissible and not prejudicial. The trial court made clear that a description of Sophia's injuries by the family members would not be allowed, but stated that the witnesses should be "allowed to say that one of the impacts is their reliving what [Sophia] might have gone through." The trial court also allowed defense counsel to lodge a continuing objection to this kind of testimony.

Later, Sophia's brother, Gilberto Torres, testified that he thought about Sophia every day, "especially for the brutal way she died."

We have previously held evidence of this kind admissible at the penalty phase of a capital case. In *People v. Pollock* (2004) 32 Cal.4th 1153 [13 Cal.Rptr.3d 34, 89 P.3d 353], the victims, an elderly married couple, died of multiple stab wounds inflicted by a butcher knife. We examined victim impact testimony from the deceased victims' loved ones describing how their "grief was exacerbated by knowledge of the 'savage' manner in which" the victims were killed "and the pain they must have experienced during their final minutes." (*Id.* at p. 1166.) A friend of the deceased described her shock at the couple's death and "the brutal manner in which they died," and the couple's surviving son testified about how "the circumstances of his parents' deaths made it impossible for him to remember his parents, or his own childhood, without in some manner imagining the suffering of their final minutes." (*Id.* at p. 1182.) We found no Eighth Amendment violation and concluded the testimony "was proper and admissible victim impact evidence" because their testimony was "limited to how the crimes had directly affected them" and they "did not testify merely to their personal opinions about the murders." (*Pollock*, at p. 1182.) The testimony in the present case is no different.

### (b) *Testimony of the Surviving Victims*

Defendant claims that, in death penalty cases, the Eighth Amendment, due process, and the right to a fair trial prohibit victims of a defendant's noncapital crimes from providing testimony about the impact of those crimes. He also argues that the testimony of Maria M. and Sabrina P. had no relevance to the circumstances of the capital crime within the meaning of section 190.3, factor (a).

 Defendant has forfeited these claims on appeal because defense counsel objected to this evidence only on Evidence Code section 352 grounds. In any event, even if we assume defendant preserved his claims for this appeal, they lack merit. Although the impact of defendant's assaults on Maria and Sabrina were not relevant to the circumstances of the capital crime under factor (a), they were relevant and admissible as "evidence of the emotional effect" of defendant's other violent criminal acts under section 190.3, factor (b). (*People v. Price, supra*, 1 Cal.4th 324, 479.) We have rejected the contention that such evidence violates the Eighth Amendment. (*People v. Davis* (2009) 46 Cal.4th 539, 617–618 [94 Cal.Rptr.3d 322, 208 P.3d 78].)

### 2. *The Unconstitutionality of Section 190.3, Factor (a) As Applied to This Case*

Defendant argues that if we interpret section 190.3, factor (a) to allow multiple family members to testify as to how the nature of Sophia's murder

affected them, when none of them personally witnessed the offense, we will render that statute unconstitutionally vague and overbroad. We have repeatedly rejected identical arguments in other cases, and defendant fails to convince us to reconsider those decisions. (*People v. Hamilton* (2009) 45 Cal.4th 863, 931 [89 Cal.Rptr.3d 286, 200 P.3d 898]; *People v. Pollock, supra,* 32 Cal.4th 1153, 1183; *People v. Boyette* (2002) 29 Cal.4th 381, 443–445 & fn. 12 [127 Cal.Rptr.2d 544, 58 P.3d 391].)

### C. *Evidentiary Rulings on Adjustment Potential*

Before his testimony at the penalty phase, the trial court limited the testimony of defense corrections expert James Esten. Defendant sought to have Esten detail the conditions of confinement for an inmate sentenced to a life term in a level 4 maximum security prison. Defendant made an offer of proof in which Esten would describe the specific level 4 prison conditions designed to minimize the risks of escape and of an inmate assaulting staff members or other inmates. As further support, defendant offered exhibits describing some of the procedures and safety measures employed by the Department of Corrections as well as pictures of inmate cells, the secured toilet, sink, and bunk fixtures inside the inmate cell, the secured tables and seating at an inmate dining hall, and the outdoor security fencing at a level 4 institution.

Defendant argued this evidence was relevant to whether defendant had the potential to successfully adjust to life in prison without the possibility of parole and would rebut any claim of future dangerousness. Citing this court's prior precedents, the prosecutor argued that the details of future conditions of confinement were not relevant. Additionally, he noted that the prosecution had not offered evidence of defendant's future dangerousness. The trial court agreed and ruled the exhibits inadmissible. The court made clear that Esten could not testify as to "details of the prison system," but also ruled that Esten could offer "general descriptions of prison life" as well as his opinions on defendant's future dangerousness and whether prison life was the kind of structured environment that defendant needed. The court further stated: "What I'm not going to allow him to do is to testify as to, as in the photographs in your exhibit, the floors are painted this way, the guards look this way, the tables are made out of this, the toilets are made out of that." The court also made clear that it would allow Esten to describe the level 4 classification and its subdividing classifications.

Defendant claims this ruling violated state law and his rights to due process and a reliable penalty determination under the Eighth and Fourteenth Amendments. We disagree.

■ As defendant acknowledges, we have repeatedly held that evidence concerning conditions of confinement for a person serving a sentence of life without possibility of parole is not relevant to the penalty determination because it has no bearing on the defendant's character, culpability, or the circumstances of the offense under either the federal Constitution or section 190.3, factor (k). (*People v. Jones* (2003) 29 Cal.4th 1229, 1261 [131 Cal.Rptr.2d 468, 64 P.3d 762], citing *People v. Quartermain* (1997) 16 Cal.4th 600, 632 [66 Cal.Rptr.2d 609, 941 P.2d 788]; *People v. Daniels* (1991) 52 Cal.3d 815, 876–878 [277 Cal.Rptr. 122, 802 P.2d 906]; *People v. Thompson* (1988) 45 Cal.3d 86, 138–139 [246 Cal.Rptr. 245, 753 P.2d 37].)

■ More importantly, "[d]escribing future conditions of confinement for a person serving life without possibility of parole involves speculation as to what future officials in another branch of government will or will not do." (*People v. Thompson, supra,* 45 Cal.3d 86, 139.) The evidence defendant sought to admit assumed that the specific security measures of daily prison life would remain unchanged throughout his supposed life sentence. It also presupposed that defendant would be housed at a particular facility that had the safety measures depicted in the photographic exhibits. As the trial court recognized, it was not reasonable to assume that these precise conditions would remain static throughout a life sentence, and the court properly limited Esten's testimony to general descriptions of prison life. (*People v. Fauber* (1992) 2 Cal.4th 792, 856 [9 Cal.Rptr.2d 24, 831 P.2d 249] [even at the penalty phase of a capital trial, "the trial court determines relevancy in the first instance and retains discretion to exclude evidence whose probative value is substantially outweighed by the probability that its admission will create substantial danger of confusing the issues or misleading the jury"]; see also *Lockett v. Ohio* (1978) 438 U.S. 586, 604, fn. 12 [57 L.Ed.2d 973, 98 S.Ct. 2954].) The trial court's ruling was narrow and did not otherwise interfere with Esten's opinions concerning defendant's future dangerousness or his ability to conform to a structured environment.

### D. *Prosecutorial Misconduct at the Penalty Phase*

Defendant claims the prosecutor engaged in various acts of misconduct during the penalty phase by appealing to the passions and prejudices of the jury, thereby denying him due process and a fair and reliable penalty trial. We disagree.

"The same standard applicable to prosecutorial misconduct at the guilt phase is applicable at the penalty phase. [Citation.] A defendant must timely object and request a curative instruction or admonishment. Failure to do so forfeits the claim on appeal unless the admonition would have been ineffective. [Citation.]" (*People v. Valdez* (2004) 32 Cal.4th 73, 132 [8 Cal.Rptr.3d

271, 82 P.3d 296], citing *People v. Cunningham* (2001) 25 Cal.4th 926, 1019 [108 Cal.Rptr.2d 291, 25 P.3d 519].)

At the outset, we note that defendant forfeited his claim regarding each act of alleged misconduct by failing to object at trial, and he fails to demonstrate why an objection was not required in each instance. Moreover, even assuming defendant had properly preserved these issues for review, we conclude in each instance that either no misconduct occurred or any misconduct did not prejudice defendant.

First, defendant claims the prosecutor, in cross-examining Dr. Wu and Esten, repeatedly began his questions with statements intended to curry favor with the jurors and to imply that the witnesses were being misleading and untruthful. Defendant takes issue with eight different statements the prosecutor made during his cross-examination of the witnesses: (1) "All right. So just to bring it back so we have it clear for the jury . . ."; (2) "Okay. So—and that's another thing I think this jury needs to know . . ."; (3) "It's your testimony to the ladies and gentlemen of this jury . . ."; (4) "You told the ladies and gentlemen of the jury . . ."; (5) "[J]ust so the jury knows . . ."; (6) "I'm not going to sit here with the jury, eyeball to eyeball, while I read these articles"; (7) "Okay. It's a very simple point I want to make. Just so the jury doesn't have a misimpression about what went on here . . ."; (8) "[J]ust so you don't confuse the jury . . . ."

Defendant acknowledges that defense counsel made no objection to any of these statements, but even assuming he had objected, these statements do not constitute misconduct either individually or cumulatively. Contrary to defendant's claim, read in context, none of these statements suggested that the witnesses were being intentionally misleading or untruthful. Instead, they simply reflected the prosecutor's attempt to eliminate potential confusion raised by the complex subject matter discussed by each witness—e.g., how PET scans work, which PET scans supported Dr. Wu's opinion that defendant's brain activity was abnormal, the scientific articles relevant to PET scans, and the voluminous documentary evidence Esten used in reaching his conclusions. To the extent that some of the prosecutor's statements were rhetorical devices (i.e., "According to your testimony to the ladies and gentlemen of the jury . . ."), such devices are routinely used by attorneys during the examination of witnesses and are hardly objectionable.

Second, defendant contends the prosecutor went beyond the scope of the defense's direct examination by improperly cross-examining Esten about prisoner marriage, conjugal visits, and whether a prison killing was a rite of passage for initiation into a prison gang. Defense counsel lodged no objection to any of this cross-examination.

As to the issue of prison gangs, *defense counsel* raised the issue of defendant's future dangerousness by asking Esten questions about the existence of prison gangs, whether defendant had expressed interest in joining such a gang, and how the prison would house defendant if he chose to join a prison gang. As we stated in *People v. Gates, supra,* 43 Cal.3d 1168, 1211: "If the defense chooses to raise the subject [of future dangerousness] it cannot expect immunity from cross-examination on it." Therefore, the prosecutor properly asked followup questions on this subject.

As to the questions regarding the possibility of future policy changes allowing life prisoners to marry and enjoy conjugal visits, we need not decide whether the prosecutor's questions on this subject were improper. Defense counsel established during Esten's redirect examination that it was extremely unlikely the public would support such a future policy change and that public pressure has generally supported a trend towards more restrictive prison regulations. Given this testimony, any error was harmless.

Defendant next claims that, during closing argument, the prosecutor improperly implored the jury to send a message to the community by stating: "[W]hat the death penalty will do in this case is that it certainly will restore the confidence and the trust in the system's ability to deal with people that transgress it and that do it in situations that are so aggravated and without sufficient justifying or mitigating circumstances that the public can see justice is done. They can see and the families can see that justice means more than sympathy, and mercy, and warehousing, and rehabilitation, and that it takes into account the defendant's conduct and the method and manner of his crimes and the impacts that it's had on the ones who suffered."

Again, defendant has forfeited this issue by failing to object to this argument or request an admonition. Although defense counsel, before the penalty phase closing argument began, obtained a trial court ruling prohibiting the prosecution from arguing that the jury should return a death sentence in order to send a message of deterrence to the community, the trial court also made clear that there may be other "comments about society or community" that could be permissible, but that "subject to what happens during argument, [defense counsel] can be free to object." We see nothing in the prosecutor's challenged statement addressing the issue of deterrence and, therefore, nothing freeing defense counsel from the obligation to object.

Moreover, the claim lacks merit. We have recently explained that a prosecutor does not err "by devoting some remarks to a reasoned argument

that the death penalty, where imposed in deserving cases, is a valid form of community retribution or vengeance—i.e., punishment—exacted by the state, under controlled circumstances, and on behalf of all its members, in lieu of the right of personal retaliation" because "[r]etribution on behalf of the community *is* an important purpose of all society's punishments, including the death penalty. [Citations.]" (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1178 [63 Cal.Rptr.3d 297, 163 P.3d 4], overruled on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421 [87 Cal.Rptr.3d 209, 198 P.3d 11].) Here, the prosecutor did not solicit "untethered passions" nor did he "dissuade jurors from making individual decisions"—instead, he properly argued that "the community, acting on behalf of those injured, has the right to express its values by imposing the severest punishment for the most aggravated crimes." (*Zambrano*, at p. 1179.) As a result, there was no misconduct.

Finally, defendant contends the prosecutor engaged in misconduct during closing argument by speculating that "if they change the regulations" for inmates sentenced to life imprisonment, such a sentence might give defendant a chance "to have a wife and family"—a chance he denied Sophia Torres. Again, however, defense counsel did not object to this comment, nor was the comment specifically prohibited under the trial court's prior ruling that Esten was not to testify as to the details of future prison conditions. Even assuming that the prosecutor's brief comment was improper, it could not have prejudiced defendant. As previously noted, defense counsel effectively dealt with this argument by establishing that it was unlikely that public opinion would allow a reversion to the old regulations permitting conjugal visits, an argument which he repeated in his own closing argument. Therefore, the jury would have been well aware that the prosecution's remarks were speculative, and any error was harmless.

### E. The Constitutionality of the Special Circumstances as Applied to This Case

Defendant claims that, as applied in the present case, the robbery and rape special circumstance allegations violated the Eighth Amendment to the federal Constitution because they allowed the jury to impose death for an accidental or unforeseeable killing. Defendant further claims that his 911 call is evidence that Sophia's death was negligent, accidental, or wholly unforeseeable.

As defendant acknowledges, however, since 1987 we have repeatedly rejected the claim that an intent to kill or any other similar mental state

is required under the Eighth Amendment in order to establish death eligibility for the actual killer in a felony murder, and we have also rejected the related claim that the imposition of the death penalty under these circumstances fails to adequately narrow the class of death-eligible offenders. (*People v. Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306]; *People v. Earp* (1999) 20 Cal.4th 826, 905 [85 Cal.Rptr.2d 857, 978 P.2d 15]; *People v. Stanley* (2006) 39 Cal.4th 913, 958, 968 [47 Cal.Rptr.3d 420, 140 P.3d 736].) Therefore, even if the jury could have found that defendant's 911 call negated evidence of an intent to kill, defendant's claim lacks merit.

### F. *Constitutionality of California's Death Penalty Law*

Defendant raises a number of constitutional challenges to California's death penalty law, all of which we have repeatedly rejected, and defendant offers no persuasive reason to reexamine these prior decisions. Thus, we again hold:

California's death penalty statute adequately narrows the class of death-eligible offenders. (*People v. Watson* (2008) 43 Cal.4th 652, 703 [76 Cal.Rptr.3d 208, 182 P.3d 543].)

Section 190.3, factor (a), which allows the jury to consider the circumstances of the crime, does not result in arbitrary or capricious imposition of the death penalty. (*People v. Hamilton, supra,* 45 Cal.4th 863, 960.)

The death penalty law does not require that the jury achieve unanimity as to aggravating circumstances or that it be given burden of proof or standard of proof instructions for finding the existence of aggravating factors, finding that aggravating factors outweigh mitigating factors, or finding that death is the appropriate penalty. (*People v. Hamilton, supra,* 45 Cal.4th at p. 960.) The United States Supreme Court decisions in *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348], *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428], *Blakely v. Washington* (2004) 542 U.S. 296 [159 L.Ed.2d 403, 124 S.Ct. 2531], *U.S. v. Booker* (2005) 543 U.S. 220 [160 L.Ed.2d 621, 125 S.Ct. 738], or their progeny, have not altered these conclusions. (*People v. Bunyard* (2009) 45 Cal.4th 836, 858 [89 Cal.Rptr.3d 264, 200 P.3d 879].)

There is no requirement for a jury in a capital case to make written findings. (*People v. Hamilton, supra,* 45 Cal.4th at p. 960.)

The failure to require intercase proportionality review does not render the death penalty law unconstitutional. (*People v. Hamilton, supra*, 45 Cal.4th at p. 960; *People v. Watson, supra*, 43 Cal.4th at p. 704.)

At the penalty phase, the jury properly may consider a defendant's unadjudicated criminal activity and need not agree unanimously or beyond a reasonable doubt that the defendant committed those acts. (*People v. Watson, supra*, 43 Cal.4th at p. 704; *People v. Hoyos* (2007) 41 Cal.4th 872, 927 [63 Cal.Rptr.3d 1, 162 P.3d 528].)

The use of restrictive adjectives, such as "extreme" and "substantial," in the statute's list of potential mitigating factors does not render it unconstitutional. (*People v. Watson, supra*, 43 Cal.4th at p. 704.)

There is no constitutional obligation to instruct the jury to identify which factors are aggravating and which are mitigating, or to instruct the jury to restrict its consideration of evidence in this regard. (*People v. Hamilton, supra*, 45 Cal.4th at p. 961.)

Since we have concluded that capital defendants and noncapital defendants are not similarly situated, the death penalty law does not violate equal protection by denying capital defendants various procedural rights given to noncapital defendants. (*People v. Riggs* (2008) 44 Cal.4th 248, 330 [79 Cal.Rptr.3d 648, 187 P.3d 363].)

Finally, as we have done repeatedly in prior cases, we again reject the claim that the death penalty itself violates international law or international norms or that these norms require the application of the penalty to only the most extraordinary crimes. (*People v. Gutierrez* (2009) 45 Cal.4th 789, 834 [89 Cal.Rptr.3d 225, 200 P.3d 847]; *People v. Panah* (2005) 35 Cal.4th 395, 500–501 [25 Cal.Rptr.3d 672, 107 P.3d 790].)

### G. *Cumulative Error at the Penalty Phase*

Defendant argues that the cumulative effect of errors in the penalty phase requires reversal. The only possible error we have identified was the prosecutor's suggestion during closing argument that future prison regulations may allow conjugal visits for inmates sentenced to life imprisonment. We concluded that this suggestion, even assuming it was error, was harmless and could not have prejudiced defendant.

## V. DISPOSITION

We affirm the judgment.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Corrigan, J., concurred.