Filed 3/7/14  P. v. Smith CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>HARRY DESHAZO SMITH,<br><br>        Defendant and Appellant. | A135142<br><br>(San Francisco County<br>Super. Ct. No. 216878) |

Harry Deshazo Smith (appellant) was convicted, following a jury trial, of mayhem, domestic violence, assault by means of force likely to cause great bodily injury, battery with serious bodily injury, and grand theft.  On appeal, he contends (1) the evidence of grand theft was insufficient to support the conviction, and (2) the trial court's failure to fully instruct on grand theft from the person was prejudicial error.  We shall affirm the judgment.

### PROCEDURAL BACKGROUND

Appellant was charged by information with mayhem (Pen. Code, § 203—count I);[1] second degree robbery (§ 211—count II); domestic violence (§ 273.5, subd. (a)—count III); assault with force likely to cause great bodily injury (§ 245, subd. (a)(1)—count IV); battery with serious bodily injury (§ 243, subd. (d)—count V); and possession of a controlled substance, cocaine salt (Health & Saf. Code, § 11350, subd. (a)—count

---

[1]All further statutory references are to the Penal Code unless otherwise indicated.

1

VI).[2] The information further alleged, as to counts II, III, IV, and V that appellant had personally inflicted great bodily injury on the victim (§ 12022.7, subd. (e)).

Following a jury trial, the jury found appellant guilty as charged as to counts I, III, IV, and V, and guilty of grand theft from the person (§ 487), a lesser included crime to the second degree robbery charged in count II. The jury found true the enhancement allegations, except as to count II.

On March 9, 2012, the trial court sentenced appellant to a total term of eight years, eight months in state prison.

On March 13, 2012, appellant filed a notice of appeal.

### FACTUAL BACKGROUND

#### Prosecution Case

Tiera S. testified that, on July 31, 2011, she was working at the Market Street Cinema (the club) in San Francisco as a nude dancer. Appellant also worked at the club as a "floor walker/security guard." He was her boyfriend. Tiera S. lived in Vallejo, but she and appellant stayed together in hotels in San Francisco about four or five nights a week. She paid for the hotel rooms. Tiera S. considered their relationship very serious, but appellant did not want club management to know they were dating.

On July 31, 2011, Tiera S. and appellant got into an argument at work. She had brought a small bottle of Hennessy liquor into the club and, when she took it out of her purse to take a sip from it, appellant saw her and took the bottle away. He told her she was not supposed to have alcohol at work. She said to give her back the bottle; she had drunk in the club before and it had not been a problem.

Tiera S. then asked Harley Hall, the club manager, if she was allowed to have the bottle in the club, and told him that appellant had taken her bottle away. Harley asked her why appellant had taken her bottle. Tiera S., who was "a little bit worked up about it," went back over to appellant and told him that Harley had said it was okay for her to

---

[2]The court subsequently dismissed count VI at the prosecutor's request.

2

have her bottle. Appellant said he would return the bottle, and directed her to come with him.

Tiera S. followed appellant to double doors, but said she did not want to go further because she did not know where the doors led. Appellant pushed her outside. He looked mad. Once they were outside, appellant hit her in the face with his knee. She fell to the ground and blacked out, though she could feel him kicking her after that.

The next thing Tiera S. remembered was waking up in an ambulance and feeling shocked. At the hospital, she saw that her face was swollen and she had a black eye. She had cuts under her eye and on her top lip. Three of her teeth were cracked. She had a scar on her neck and on the side of her mouth, and had scratches on her left arm. While at the hospital, she got eight stitches in her lip.

Tiera S. had $1,900 in her purse that night at the club; she knew the amount because she had counted it recently. She normally carried all her money with her at work. She had her purse with her when appellant pushed her though the double doors, and when she woke up in the ambulance, her purse was on her arm. "It was on my arm the whole time." When she looked in her purse at the hospital, there was only $200 in it. There was also blood on her purse, which was not there before the attack. Tiera S. told Inspector Flores, the police officer who interviewed her at the hospital, about what appellant had done to her and about the missing money.

At trial, Tiera S. identified a photograph of herself holding her money during the week before the incident; the photo was taken "[j]ust for fun." The photo depicted some of the money that was in her purse on the night of the attack. Although she paid for some of their activities, Tiera S. never shared money with appellant and never held his money for him. She estimated that she earned $2,000 a week at the club during July, but had to give some of it to the club.

At the time of the trial, Robert Robledo was the general manager of the Market Street Cinema. On July 31, 2011, he was a club manager. He knew Tiera S. as "Candy," and described her as very quiet and sweet, but "kind of slow." Appellant was a floor walker at the club. On the early morning of July 31, a floor walker named Danny called

3

Robledo on the radio and said there was a dancer "laid out in the alley." Robledo ran out to the alley, where he found Danny with Tiera S. She was lying on her back on the ground, with a big circle of blood under her head. She kept asking what happened and where she was. Appellant was standing in the doorway watching them. He was rocking back and forth and seemed nervous.

Robledo called 911, and then he, Danny, and then general manager Harley Hall carried Tiera S. into the club's office, where they laid her down on the carpeted floor. After the fire department arrived, Robledo, Hall, and fire department personnel began reviewing surveillance videotapes to try to find out what had happened. Videotape they watched showed that, as Tiera S. and appellant walked out to the alley, she pulled back. Appellant's arm could then be seen reaching around and pulling her into the alley. Robledo testified that police officers arrived soon after they began reviewing the surveillance video. The officers also watched the videotape before calling appellant into the office. Appellant said that he had found Tiera S. lying in the alley and that she "had fallen or passed out, maybe hit herself on . . . a toolbox in the alley made of metal." He also may have mentioned that she was drunk.

Harley Hall, who was the general manager of the Market Street Cinema in July 2011, testified that dancers at the club are independent contractors who share a percentage of their nightly profits with the club. Most transactions are in cash. Floor walkers provide security and monitor the dancers.

Tiera S. was a dancer at the club. Hall "considered her to be slow." Tiera S. worked on the night of July 30 into the early morning of July 31, 2011. At one point, she walked up to him and said, "They took my bottle" of Hennessy. He responded that she was not supposed to have a bottle on the floor, since it was against company policy.

Thirty minutes or an hour later, Robledo called Hall on his radio and said that Tiera S. was passed out in the alley. Hall went outside, where he saw Tiera S. lying on her back on the ground with injuries to her face. She eventually rolled onto her side and asked if she had been in a fight. She then sprang to her feet and asked what had

4

happened to her. Hall and other club employees took her to the office until firefighters arrived and took her to the hospital.

Hall then instructed everyone involved in the incident, including appellant, to fill out an incident report. Appellant reported that, while he was on his nightly security rounds, he walked out to the alley and found Tiera S. lying there. He said that he then ran back inside and found a fellow floor walker to assist him.

Hall reviewed security camera footage with some of the firefighters. There were no cameras outside in the alley, but there were cameras throughout the club. The footage showed Tiera S. walking back and forth near the DJ's booth several times within a few minutes. The video then showed appellant walking toward the doors to the alley with Tiera S. right behind him. It showed her stopping at the curtain in front of the doors, and then showed an arm coming through the curtain and pulling her out into the alley.

Hall testified that some police officers arrived a short time later. They also reviewed the surveillance video. An officer asked appellant, who was in the office as well, if he wanted to change his statement. Appellant said that he had not wanted to say what had happened because he was afraid Hall would get upset with him. He said that Tiera S. had been drinking and was acting out of line, so he was trying to pull her off to the side to calm her down. They were going to go outside and talk, but when she stepped into the dark alley, she tripped and fell, and hit a metal toolbox.

The police officers arrested appellant. They asked him if money they took from his pocket during the arrest was his and he said he had been saving it. He tried to give the money to a coworker, but the police took it. When Hall later took some officers out to the alley, it had been cleaned and there was no blood on the ground. The club janitor said a dancer had told him to clean the alley.

Anthony Pedroza, a San Francisco police officer, testified that he went to the Market Street Cinema at 2:25 a.m. on July 31, 2011. He went into the club's office and met with manager Harley Hall. Several other people were in the office, including appellant. Appellant told Pedroza that a dancer had gone into the back alley by herself and had passed out from intoxication. He said he had found her there. Pedroza then

looked at the surveillance video, which showed appellant walking up to some drapes, followed by a woman.  After appellant walked through the drapes, the video showed that the woman hesitated.  Then an arm came back through the drapes, grabbed her by the waist, and dragged her out.

Pedroza spoke with Officer Cronin, who was with the victim at the hospital.  Cronin told Pedroza to arrest appellant for a "domestic violence incident."  After Pedroza arrested and handcuffed appellant, appellant tried to reach into a pocket.  Pedroza seized a "large wad" of money, as well as a tightly folded-up dollar bill from that pocket.  The dollar bill had a loose white powder inside, which Pedroza suspected was cocaine.  As appellant was removed from the office, he asked for his property to be given to another security guard who was present.  Pedroza refused.  The total amount of money taken from appellant's pocket was later determined to be $1,421.

San Francisco Police Department Inspector Antonio Flores testified that Tiera S. gave him a photograph she had on her phone.  The photo was of herself holding cash and was taken sometime before the incident on July 31, 2011.  In the photograph, only three of the hundred dollar bills had full or partial serial numbers that were visible.  All three serial numbers matched three of the hundred dollar bills found in appellant's pocket after his arrest.

San Francisco chief medical examiner Amy Hart testified that she had reviewed Tiera S.'s medical records.  The paramedics who first attended to Tiera S. had described her injuries as blunt trauma to the face.  They described soft tissue injuries and swelling to the left cheek and left upper lip, as well as broken teeth.  She also had an odor of alcohol on her breath.  The emergency medical personnel who came to the club had noted that Tiera S. reported:  " 'Rico did it.  He works at the club.  Look, he's right there.' "  After describing all of the injuries reported in the records of the incident, Dr. Hart testified that the totality of Tiera S.'s injuries were inconsistent with a collapse onto a flat surface because of the number and location of the injuries.

Helema O. testified that she and appellant had dated for about four weeks in September 2010.  Appellant went by the nickname, "Rico."  On September 19, 2010,

6

Helema O. and appellant got into an argument in the backyard of her house. She got frustrated, went inside, and locked the door behind her. Appellant banged on a window and yelled that his "stuff" was inside. She did not respond, but heard glass breaking and the door opening. She was scared, so she shut her bedroom door. Appellant then entered the room, screaming at her.

Appellant pushed Helema O. against a desk so she could not move. His face was about three inches away from hers, and he was screaming things like, " 'Why would you do that? That's disrespectful. Don't ever do that. Don't ever play me like that.' " She yelled at him to stop and get away from her, but he would not stop. So she slapped him. Appellant, still yelling, put his hand around the front of her neck and squeezed. He eventually let go of her neck and they continued yelling at each other. They ended up outside again but, when appellant tried to reenter the house, she physically tried to keep him out. Appellant was holding her by her upper arms when they both fell to the ground. When a neighbor yelled, " 'Is everything okay?' " Helema O. asked the neighbor to call the police. Appellant left when the neighbor said the police were on their way As a result of the incident, Helema O. had bruises on her arms and neck, as well as cuts on her elbow and fingers.

## Defense Case

Police officer Ken Kikuchi spoke to Tiera S. at the hospital on July 31, 2011. Tiera S. said she did not remember being assaulted. She said she believed that appellant had assaulted her because he had dragged her to the alley before she blacked out and, when she regained consciousness, she had injuries she did not have beforehand. Tiera S. also told Kikuchi that she was missing approximately $1,900 that was in her purse before she blacked out. She said that appellant had taken it.

Tara Godoy, a legal nurse consultant, testified as an expert in traumatic injury. Godoy believed that Tiera S.'s injuries were consistent with her tripping, hitting a wall, and sliding down. They were also consistent with her tripping and hitting her head against a tool box that was in the alley, and falling to the ground. The injuries were also consistent with her tripping, hitting her head against a handrail, and falling to the ground.

7

Tiera S.'s lip laceration and broken teeth could have been caused by being kneed in the face, but the other injuries to her face could not have been caused by that. Injuries to her neck could have been caused by the cervical collar medical personnel put on her after the incident.

Lea D., who worked as an entertainer at the Market Street Cinema, testified that she had known appellant for four or five months. They were friends and had dated. She described appellant as a nonviolent, gentle, protective, nice person. As far as she knew, he was also honest. Lea D. knew Tiera S., and had seen her on July 31, 2011, drinking from a bottle of Hennessy.

On cross-examination, Lea D. testified that she was in a relationship with appellant on July 31, and did not know that he was also in a relationship with Tiera S. Nor did she know that appellant had been convicted of misdemeanor domestic violence in 2010. She acknowledged that, during a recorded phone call from jail, appellant had threatened to "beat [her] motherfucking ass," but said that he was "just playing around." Lea D. never felt threatened by anything appellant said or did.

Phyllis Smith, appellant's mother, testified that, as a child, appellant was diagnosed with ADHD, which still affected his ability to focus and "get[] the big picture." She described him as a "happy-go-lucky kind of guy." She did not know him to be a violent man.

Appellant testified that Helema O. was one of the first girls he was in love with. She got angry with him one night when they were at her house because he was tired and did not want to have sex. Helema O. believed it was because he had been with other girls. They went outside and talked, but she eventually ran into the house with his cell phone. As he tried to follow her inside through the door, he accidentally cracked the glass around the doorknob. He then started knocking on the window. He was cold and wanted to get his belongings, which were inside the house. He eventually chipped off some of the glass on the cracked door and let himself inside.

They continued to argue in Helema O.'s bedroom and she slapped him. Appellant grabbed her arm, threw her on the bed, gathered up some of his belongings, and went

8

outside. When he tried to get back inside to get the rest of his things, she grabbed him and they fell to the ground. He then went and got the rest of his things and left. He did not recall choking her. He pleaded guilty to domestic violence because his attorney had told him, "this is not a big thing, we can have your record expunged by doing 52 weeks of domestic violence classes . . . ."

Appellant became involved in a relationship with Tiera S. after she began working at the Market Street Cinema as a dancer. He had worked there for about five months. They began living together at a hotel about a week before the July 31, 2011, incident. Defense counsel showed an excerpt of the surveillance video from July 31, which appellant said showed Tiera S. drinking from a bottle of Hennessey, which she had pulled out of her purse. It also showed her throwing up. After appellant told her to stop drinking, Tiera S. was yelling, so he pulled her outside to talk to her one on one.

Tiera S. and appellant went outside and appellant started talking to her. But she just paced back and forth and covered her ears. He decided it was a waste of time trying to talk to her. As he headed back inside the club, she fell and he saw her hit the ground. He asked if she was alright, but she did not respond. He tried to lift her, but she was not moving, so he laid her back down and went inside to get help. When appellant later gave a couple of statements in the office, he was feeling scared for her and for his job.

Appellant testified that he took the photograph of Tiera S. holding money. They were in their hotel room and Tiera S. was playing with his money, which he had left on the dresser. So he took a picture of her holding his money.

Appellant did not attack Tiera S. on July 31, 2011, and he did not take her money.

### DISCUSSION

#### I. *Sufficiency of the Evidence of Grand Theft*

Appellant contends the evidence that he took Tiera S.'s money directly from her person was insufficient to support his conviction for grand theft from the person of another.

"To determine the sufficiency of the evidence to support a conviction, an appellate court reviews the entire record in the light most favorable to the prosecution to determine

whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Valdez* (2004) 32 Cal.4th 73, 104.)

The crime of theft is divided into two degrees:  petty theft and grand theft.  (§ 486.)  Grand theft is committed, inter alia, "[w]hen the property is taken from the person of another."  (§ 487, subd. (c).)

In *In re Jesus O.* (2007) 40 Cal.4th 859, the California Supreme Court addressed what evidence is required to prove grand theft from the person.   The court discussed "[t]he seminal California case," *People v. McElroy* (1897) 116 Cal. 583, in which the high court discussed the "from the person" requirement, explaining that the statute's purpose was to protect people and their property against thieves who obtain property by " 'means of stealth or fraud, and that it was in contemplation that the property shall at the time be in some way actually upon or attached to the person, or carried or held in actual physical possession—such as[, inter alia,] property held or carried in the hands, or by other means upon the person; that it was not intended to include property removed from the person and laid aside, however immediately it may be retained in the presence or constructive control or possession of the owner while so laid away from his person and out of his hands. . . .' " (*In re Jesus O*, at pp. 862–863, quoting *People v. McElroy*, at p. 586 [where evidence showed that defendant had taken money from victim's pants pocket after victim had removed his pants and rolled them up to use as a pillow, there was no taking "from the person of another" and defendant's grand theft conviction was reversed].)

Here, appellant argues that the record does not contain substantial evidence that, when he took the money from Tiera S.'s purse, her purse was physically connected to her body, so as to support a conviction for grand theft from the person.  According to appellant, "[w]hile there was evidence that [Tiera S.] had her purse both before she went into the alley and when she was taken to the office and to the hospital, there is insufficient evidence of [Tiera S.'s] physical possession of the purse in the alley."  We disagree.

10

The relevant evidence presented at trial includes the following. Tiera S. testified that she kept all of her money in her purse, which she carried while she was at work. She further testified that she had her purse on her arm when appellant pushed her into the alley and that it was still on her arm in the ambulance; "[i]t was on my arm the whole time."[3]

Appellant argues that, despite this evidence, the testimony of general manager Robert Robledo that he did not recall seeing the purse on Tiera S.'s shoulder in the alley shows that there is insufficient evidence that she had physical possession of the purse at the moment appellant took the money from it. Robledo's testimony, however, does not provide evidence of lack of physical possession. In response to the court's question as to whether he saw a purse on Tiera S.'s shoulder, Robledo responded, "A purse. Well, usually dancers carry boxes, they're little square boxes that they put the money in; but in a situation like that, you're really not concerned about what they're carrying, what they're wearing. You're trying to take care of the situation. Once you see blood, you know, it's an automatic reaction, call 911, help this person get out of that situation." When the court again asked if Robledo recalled seeing a purse, Robledo answered, "I can't recall seeing a purse, but all dancers carry boxes. They have to put their money somewhere."

Contrary to appellant's assertion, Robledo's testimony does not constitute evidence that Tiera S. was not wearing her purse while in the alley. Rather, it reflects the fact that Robledo did not notice a purse in the alley, whether on Tiera S.'s body or anywhere else, because of the emergency situation he was dealing with. Moreover, that no other witnesses mentioned seeing a purse on Tiera S.'s arm in the alley does not demonstrate that it was not there, especially given that no other witness was asked about

---

[3]Video footage from the club apparently supported Tiera S.'s testimony that she had her purse on her arm "the whole time." As appellant points out, the prosecutor stated in his closing argument: "The purse is on her left shoulder. We know that because it's in the video before the incident and after. You can actually see it in one of the frames when she's walking into the office."

it at trial.  Instead, the only evidence in the record on this question supports a finding that Tiera S.'s purse was on her shoulder when appellant took her money.[4]

In sum, we conclude that substantial evidence supports appellant's conviction for grand theft from the person.  (See *People v. Valdez* , *supra*, 32 Cal.4th at p. 104; see also § 487, subd. (c); *In re Jesus O.*, *supra*, 40 Cal.4th at p. 863.)

## II.  *Trial Court's Failure to Instruct on Grand Theft from the Person*

Appellant contends the trial court erred by failing to instruct the jury sua sponte with CALCRIM No. 1801, regarding degrees of theft.  According to appellant, this failure to fully instruct the jury on grand theft from the person was prejudicial error.

In a criminal case, a trial court is required to instruct the jury, sua sponte, on the general principles of law that are relevant to the issues raised by the evidence and necessary to the jury's understanding of the case.  (*People v. Martinez* (2010) 47 Cal.4th 911, 953.)  This includes all lesser necessarily included offenses supported by the evidence.  (*People v. Breverman* (1998) 19 Cal.4th 142, 154, 162.)  Errors or omissions of proper jury instructions are violations of federal due process because they "[preclude]

---

[4]The parties cite several cases in which courts have explored the range of circumstances in which property can be considered to have been "taken from the person of another." (§ 487, subd. (c).)  For example, in *People v. Huggins* (1997) 51 Cal.App.4th 1654, 1656, at the time of the theft, the victim was touching her purse, which was on the floor, with her foot.  The appellate court found that, because the victim had maintained contact with her purse "for the purpose of maintaining dominion and control over it," the purse had not been laid aside, but "was actually attached to [the victim's] person" when it was taken.  (*Id.* at p. 1658.)  In *In re Jesus O.*, *supra*, 40 Cal.4th 859, 868, the juvenile defendant took the victim's phone after it fell on the ground.  Our Supreme Court found that, despite the fact that the phone was not physically attached to the victim at the time of the taking, the crime still constituted grand theft from the person since there was evidence that, "while the telephone was still on [the victim's] person, the juvenile asked him if he had any money.  This evidence supports a finding that the juvenile and his cohort intended to steal property of some kind, even if not specifically the telephone when the assault that caused [the victim] to drop the telephone began, i.e., when the telephone was on [the victim's] person." (*Id.* at p. 868.)

Given our conclusion that the evidence shows that Tiera S.'s purse was on her shoulder during the taking by appellant, an examination of cases discussing the outer reaches of what constitutes a taking from the person is not necessary to our analysis.

12

the jury from making a finding on the *actual* element of the offense." (*Neder v. United States* (1999) 527 U.S. 1, 9–10.) Federal due process errors such as erroneous jury instructions are classified as trial errors and are subject to harmless error analysis. (*Ibid.*)

Here, the trial court instructed the jury with CALCRIM No. 1800, theft by larceny: "Gran[d] theft is a lesser-included offense of attempted robbery, which is a lesser-included offense of robbery as charged in Count II.

"To prove the defendant is guilty of this crime the People must prove that:

"One, the defendant took possession of property owned by someone else;

"Two, the defendant took the property without the owner's consent;

"Three, when the defendant took the property, he intended to deprive the owner of it permanently; and

"Four, the defendant moved the property even a small distance and kept it for any period of time, however brief."[5]

The court however, did not instruct the jury with CALCRIM No. 1801, which explains the degrees of theft. A Bench Note for CALCRIM No. 1801 states: "The court has a sua sponte duty to give an instruction if grand theft has been charged." (Bench Notes to CALCRIM No. 1801, "Instructional Duty.") CALCRIM No. 1801 provides in relevant part: "If you conclude that the defendant committed a theft, you must decide whether the crime was grand theft or petty theft.

"[The defendant committed grand theft if (he/she) stole property [or services worth more than $950.]

---

[5]The court also instructed the jury with CALCRIM No. 252, which provided in part: "The following crimes and allegations require a specific intent or mental state: Robbery, as alleged in Count II, and the lesser-included offense of attempted robbery and grand theft of a person.

"For you to find a person guilty of these crimes or to find the allegations true, that person must not only intentionally commit the prohibited act but must do so with a specific intent and/or mental state. The act and the specific intent or mental state required are explained in the instruction for that crime or allegation."

"[Theft of property from the person is grand theft, no matter how much the property is worth. Theft is *from the person* if the property taken was in the clothing of, on the body of, or in a container held or carried by, that person.] [¶] . . . [¶]

"All other theft is petty theft.

"The People have the burden of proving beyond a reasonable doubt that the theft was grand theft rather than a lesser crime. If the People have not met this burden, you must find the defendant not guilty of grand theft."

Appellant argues that, without the explanation provided in CALCRIM No. 1801 regarding the evidence required to convict a defendant of grand theft *from the person*, the jury could have improperly found appellant guilty of that crime without having determined that "the property taken was in the clothing of, on the body of, or in a container held or carried by" Tiera S. (CALCRIM No. 1801.)

Respondent first asserts that appellant has waived this issue by failing to object in the trial court. (See, e.g., *People v. Bolin* (1998) 18 Cal.4th 297, 326; but see *People v. Breverman*, *supra*, 19 Cal.4th at pp. 154–156.)

Respondent also asserts that "[t]he additional instruction distinguishing grand theft and petty theft was not required here. . . . The instruction now deemed crucial was not necessary for the jury's understanding of the case. The facts outlined the significant value of the property taken and the fact that the victim had her purse with her at the time."

We need not resolve this question of waiver, nor need we definitively determine the issue on the merits since we conclude that, even assuming there was no waiver and the court erred, appellant could not have been prejudiced by the failure to instruct the jury with CALCRIM No. 1801. (See, e.g., *People v. Magee* (2003) 107 Cal.App.4th 188, 193–194 [constitutional errors such as giving improper jury instructions on an element of an offense are subject to harmless error analysis, citing *Chapman v. California* (1967) 386 U.S. 18, 24].) As we thoroughly discussed in part I., *ante*, the evidence was uncontradicted that Tiera S.'s purse was in her physical possession when appellant took

money from it.  The jury thus necessarily would have found that appellant committed grand theft "from the person of another," pursuant to section 487, subdivision (c).[6]

Accordingly, even under the more rigorous federal standard, we conclude that any error by the court in failing to instruct with CALCRIM No. 1801 was harmless beyond a reasonable doubt because it did not contribute to the verdict.  (See *Chapman v. California*, *supra*, 386 U.S. at p. 24.)

### *DISPOSITION*

The judgment is affirmed.


_____
Kline, P.J.


We concur:


_____
Haerle, J.


_____
Brick, J.*


* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

A135142, *People v. Harry D. Smith*

---

[6]In light of this conclusion, we need not address the parties' dispute over whether reversal would not be warranted in any case based on evidence showing that the amount of money appellant took from Tiera S. was more than $950.  (See § 487, subd. (a) [grand theft is committed when property taken exceeds $950 in value].)